

1  PAUL M. GELB (State Bar No. 214439)
   DRINKER BIDDLE & REATH LLP
2  1800 Century Park East, Suite 1400
   Los Angeles, California 90067-1517
3  Telephone:  (310) 203-4000
   Facsimile:   (310) 229-1285
4   paul.gelb@dbr.com

5  Attorneys for Plaintiff
   NATIONWIDE LIFE AND
6  ANNUITY INSURANCE COMPANY

7

```
                    FILED
           CLERK, U.S. DISTRICT COURT

                MAR 3 0 2012

           CENTRAL DISTRICT OF CALIFORNIA
           BY _____ DEPUTY
```

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  NATIONWIDE LIFE AND          Case No. CV12-02752-GAF (MANx)
    ANNUITY INSURANCE
12  COMPANY,
                                 **FIRST AMENDED COMPLAINT**
13              Plaintiff,       **FOR DECLARATORY JUDGMENT**
                                 **AND OTHER RELIEF**
14        v.

15  JOSEPH BARTHOLOMEW, MBP
    INSURANCE SERVICES, INC.,
16  ANDREW CHUNG, STEVE
    HOSHIMI, HOWARD B. ABBOTT
17  A/K/A H. BRUCE ABBOTT,
    INDIVIDUALLY AND AS TRUSTEE
18  OF THE NORMAN PARHAM
    IRREVOCABLE TRUST, NORMAN
19  E. PARHAM, GLENDA CROSBY,
    SUSAN CROSBY-CHAMBERS,
20  MARILYN WALLACE, HERMINE
    FREEDMAN, PERCY BELL,
21  SANDRA BELL, MARY JANE
    DICARLO, PATRICK N. DICARLO,
22  DONALD MACLAY, ROBERT
    GLEESON, INDIVIDUALLY AND
23  AS TRUSTEE OF THE
    IRREVOCABLE LIFE INSURANCE
24  TRUST OF RICHARD LUKACS
    AND THE DONALD MACLAY
25  FAMILY TRUST, AND DOES 1
    through 10,
26
                Defendants.
27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

                                 1

                                        FIRST AMENDED COMPLAINT
LA01/ 1094439.1

1        Plaintiff, Nationwide Life and Annuity Insurance Company ("Nationwide"),

2   by and through its attorneys, Drinker Biddle & Reath LLP, hereby files this

3   Complaint for Declaratory Judgment and other relief, and in support thereof, avers

4   as follows:

5        1.    This complaint asserts claims for fraud, negligent misrepresentation,

6   conspiracy, breach of contract and declaratory judgment pursuant to 28 U.S.C.

7   § 2201 stemming from the fraudulent procurement of millions of dollars of life

8   insurance.  Nationwide is entitled to the relief it seeks because of, inter alia,

9   misrepresentations made to Nationwide for this life insurance and the concealment

10  of certain material facts that the Defendants (and others) knew and should have

11  communicated to Nationwide.  Nationwide is also entitled to the relief it seeks

12  because each of the seven life insurance policies (collectively, the "Policies") were

13  procured through a plan, scheme, or design, and with an agreement in place prior

14  to issuance of the Policies, to transfer the beneficial interest in the Policies to

15  stranger investors seeking to wager on the lives of the following persons: Norman

16  Parham, Glenda Crosby, Marilyn Wallace, Percy Bell, Mary Jane DiCarlo, Richard

17  Lukacs and Donald Maclay (separately an or the "Insured"; collectively, the

18  "Insureds").  There was, therefore, no valid insurable interest supporting the

19  Policies at issuance.

20       2.    Specifically, upon information and belief, the statements provided in

21  the applications and certifications submitted to Nationwide for the Policies

22  contained certain questions intended to discern, among other things, whether the

23  premiums for the Policies would be funded by third parties, and whether the

24  Policies were intended for resale into the secondary market for life insurance.  The

25  Defendants and/or others acting on their behalf, however, provided false

26  information in response to these questions.  Had Nationwide known the true

27  purpose for procuring the Policies, and had it been disclosed to Nationwide that the

28  premiums on the Policies would be paid by an unrelated third party with no

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

2

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1  insurable interest in the lives of the Insureds and/or that the Policies were intended

2  for resale into the secondary market, Nationwide would have declined issuance of

3  the Policies.

4      3.    Further, upon information and belief, the Policies were procured for

5  the purpose of transferring them, either directly or indirectly, into the secondary

6  market for life insurance.  Accordingly, the Policies were not merely the product of

7  fraud, but they were also illegal wagering contracts.

8      4.    Nationwide thus seeks equitable relief in the form of a declaration that

9  the Policies are void ab initio because (i) the Policies were procured based on

10  material misrepresentations in the policy applications; and (ii) for the lack of a

11  valid insurable interest supporting the Policies at issuance.  Nationwide further

12  seeks a declaration that the Defendants and/or others involved in these fraudulent

13  transactions are estopped from seeking a return of premiums in connection with the

14  Policies.  To the extent that the Defendants and/or others are not estopped from

15  seeking a return of premiums, Nationwide alternatively seeks equitable relief in the

16  form of a declaration that Nationwide is entitled to offset any return of premiums

17  by the costs it incurred in connection with the Policies.  Nationwide also seeks a

18  return of commissions paid in connection with Policies, as well as compensatory

19  and punitive damages against the promoters of this illegal plan, scheme or design.

20      5.    Nationwide will continue to treat each of the Policies as in-force

21  unless and until it receives the relief it seeks from the Court in this declaratory

22  judgment action (and/or any of the Policies otherwise lapses).  Nationwide's

23  treatment of each Policy as in-force is not intended to be a waiver of any of the

24  positions asserted in this action or any other rights under the Policies or at law.

25                              **PARTIES**

26      6.    Plaintiff Nationwide is a life insurance company organized and

27  existing under the laws of Ohio, with its principal place of business and nerve

28  center at One Nationwide Plaza, Columbus, Ohio 43215-2220.  Nationwide is a

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

3

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    citizen of the State of Ohio.

2          7.     Upon information and belief, Defendant Joseph Bartholomew

3    ("Bartholomew") is a natural citizen of the State of California who resides at

4    25011 Calle Arenal, Lake Forest, California 92630.  Upon information and belief,

5    and at all times relevant hereto, Bartholomew was an insurance producer engaged

6    in the business of producing and servicing insurance policies, and regularly doing

7    so in the State of California.  Bartholomew was the insurance producer responsible

8    for placing the Policies with Nationwide.

9          8.     Upon information and belief, Defendant MBP Insurance Services, Inc.

10   ("MBP") is a corporation which is organized under the laws of the State of

11   California, with its principal place of business and nerve center at of 23046

12   Avenida de la Carlota, Ste. 240, Laguna Hills, CA 92653.  MBP is a citizen of the

13   State of California.  Bartholomew is the president of MBP and MBP was also

14   involved in the procurement of the Policies.

15         9.     Upon information and belief, Defendant Andrew Chung ("Chung") is

16   a natural citizen of the State of California who resides at 1101 West Stevens Ave,

17   Apt. 90, Santa Ana, California 92707.  Upon information and belief, Chung is an

18   employee of Bartholomew and/or MBP who assisted in the procurement of the

19   Policies.

20         10.    Upon information and belief, Defendant Steve Hoshimi ("Hoshimi")

21   is a natural citizen of the State of California who resides at 1942 Port Claridge

22   Place, Newport Beach, California 92660.  Upon information and belief, Hoshimi is

23   a financial advisor who solicited insureds for participation in the illegal insurance

24   scheme under the guise of providing financial advice.

25         11.    Upon information and belief, Defendant Howard B. Abbott a/k/a H.

26   Bruce Abbott ("Abbott") is the Trustee of Norman Parham Irrevocable Trust (the

27   "Parham Trust"), and he is named as a defendant herein both individually and as

28   Trustee of the Parham Trust.  The Parham Trust is the purported owner and

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

4

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   beneficiary of the policy insuring the life of Norman E. Parham (the "Parham

2   Policy"). Upon information and belief, Defendant Abbott is a natural person and

3   citizen of the State of California, residing therein at 25 Brittany, Newport Beach,

4   California 92660-4239.

5        12.   Upon information and belief, Defendant Norman E. Parham

6   ("Parham") is a citizen of the State of California who resides at 22 Bogey Lane,

7   Coto de Caza, California 92679. A policy of insurance was procured on Parham's

8   life (the "Parham Policy") to be purportedly owned by the Parham Trust.

9        13.   Upon information and belief, Defendant Glenda Crosby ("Crosby") is

10  a citizen of the State of California who resides at 226 Hartford, Newport Beach,

11  California 92660. A policy of insurance was procured on Crosby's life (the

12  "Crosby Policy"). Crosby is the purported owner of the Crosby Policy.

13       14.   Upon information and belief, Defendant Susan Crosby-Chambers

14  ("Chambers") is a citizen of the State of Colorado who resides at 2230 Interlocken

15  Drive, Evergreen, Colorado 80439. Chambers is the purported beneficiary of the

16  Crosby Policy.

17       15.   Upon information and belief, Defendant Marilyn Wallace ("Wallace")

18  is a citizen of the State of California who resides at 10551 Wilshire Boulevard,

19  #1505, Los Angeles, California 90024. A policy of insurance was procured on

20  Wallace's life (the "Wallace Policy"). Wallace is the purported owner of the

21  Wallace Policy.

22       16.   Upon information and belief, Defendant Hermine Freedman

23  ("Freedman") is a citizen of the State of California who resides at 78804 Stansbury

24  Court, Palm Desert, California 92211-4019. Freedman is the purported beneficiary

25  of the Wallace Policy.

26       17.   Upon information and belief, Defendant Percy Bell ("Bell") is a

27  citizen of the State of Illinois who resides at 6400 N. Cicero, #505, Lincolnwood,

28  Illinois 60712. A policy of insurance was procured on Bell's life (the "Bell

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

5

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   Policy").

2       18.     Upon information and belief, Defendant Sandra Bell ("Sandra") is a

3   citizen of the State of Illinois who resides at 6400 N. Cicero, #505, Lincolnwood,

4   Illinois 60712.  Sandra is the purported owner and beneficiary of the Bell Policy.

5       19.     Upon information and belief, Defendant Mary Jane DiCarlo

6   ("DiCarlo") is a citizen of the state of California who resides at 1221 West Coast

7   Highway, #106, Newport Beach, California 92663.  A policy of insurance was

8   procured on DiCarlo's life (the "DiCarlo Policy").

9       20.     Upon information and belief, Defendant Patrick N. DiCarlo Jr.

10  ("Patrick") is a citizen of the State of California who resides at 1012 Hyde Park

11  Drive, Santa Ana, CA 92705-2375.  Patrick is the purported beneficiary of the

12  DiCarlo Policy.

13      21.     Upon information and belief, Defendant Robert Gleeson ("Gleeson")

14  is the Trustee of the Irrevocable Life Insurance Trust of Richard Lukacs (the

15  "Lukacs Trust"), and the Irrevocable Life Insurance Trust of the Donald Maclay

16  Family (the "Maclay Trust") and he is named as a defendant herein both

17  individually and as Trustee of the Lukacs Trust and the Maclay Trust.  The Lukacs

18  Trust and the Maclay Trust are respectively the purported owners and beneficiaries

19  of the policies insuring the lives of Richard Lukacs (the "Lukacs Policy") and

20  Donald Maclay (the "Maclay Policy").  Upon information and belief, Defendant

21  Gleeson is a natural person and citizen of the State of California, residing therein at

22  3342 Brookwood Lane, Oxnard, California, 93036.

23      22.     Upon information and belief, Defendant Donald Maclay ("Maclay") is

24  a citizen of the State of California who resides at 29356 Bluewater Road, Malibu,

25  California 90265.  The Maclay policy was issued on Maclay's life.

26      23.     Nationwide joins as defendants Does 1 through 10, who are

27  individuals and/or entities the identity of which are presently unknown.

28  Nationwide is unaware of the true names and capacities of the defendants sued as

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

6

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious

2   names.  Nationwide will amend this complaint to allege the true names and

3   capacities of Doe defendants when ascertained.  Nationwide believes Does 1

4   through 10 have participated in the STOLI scheme as described more fully herein.

5   Nationwide is entitled to relief as to each of the Doe defendants in some manner

6   under the theories described in this complaint.

7        24.    At all times relevant and mentioned herein, upon information and

8   belief, Bartholomew, MBP, Hoshimi, Chung, Parham, Crosby, Bell, Sandra,

9   Wallace, DiCarlo, Maclay, Abbott, Gleeson and Does 1-10 participated as

10  members of a conspiracy in a scheme or plan to procure the Policies and, in

11  performing the acts alleged in this complaint, were acting as the agents, employees,

12  joint venturers and/or representatives of each other, and were acting within the full

13  course and scope of their agency, employment, and/or representation with the full

14  knowledge, consent, permission, authorization, and ratification, either express or

15  implied, of each other.

16                           **JURISDICTION AND VENUE**

17       25.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §

18  1332(a)(1), insofar as the matter in controversy exceeds the sum of $75,000,

19  exclusive of interest and costs, and there is complete diversity between Nationwide

20  and all Defendants.

21       26.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a),

22  because a substantial part of the events giving rise to the claims occurred herein.

23                           **FACTUAL BACKGROUND**

24  **A.    Stranger-Originated Life Insurance**

25       27.    Over the last decade, an insurance market has emerged in which

26  investors have used traditional life insurance as a morbid and speculative

27  investment vehicle, rather than for the income protection and estate planning

28  purposes for which such insurance was created.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

7

LA01/ 1094439.1

28.    In its simplest form, such an investment vehicle is created when a life insurance policy is applied for and issued at the behest of individuals or entities – with no insurable interest in the life of the insured – who later acquire some, if not all, of the interest in the death benefit payable upon the death of the insured.  Such arrangements are commonly referred to as IOLI, which stands for "investor-originated life insurance," or STOLI, which stands for "stranger-originated life insurance."  (These transactions are referred to as "STOLI" herein.)

29.    Though the STOLI market is relatively new, the underlying concept is not; indeed, in the late nineteenth and early twentieth centuries, (i) the United States Supreme Court opined against unlawful "wagering policies," and the "sinister counter interest" in the death of the insured that results from the issuance of such policies; and (ii) the California Supreme Court recognized that insurance policies in the form of illegal "wagering" contracts violated state insurable interest law and were void.

30.    State insurable interest laws, which protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued, provide a safeguard against STOLI arrangements.  However, STOLI speculators attempt to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible investments.

31.    Logically, STOLI speculators seek out the highest anticipated rates of return when choosing the life insurance policies in which they will invest.  This means the typical life insurance policy such speculators endeavor to fabricate insures the life of an individual aged sixty five or older, with a net worth of over one million dollars.  Such an individual can obtain large value policies, and, actuarially speaking, is expected to have a relatively limited lifespan.

32.    The perverse result is that the shorter the expected lifetime of the

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

8

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    insured, the more valuable the policy becomes to those who would gamble on his

2    or her life; in short, a "sinister counter interest" in the death of the insured, of the

3    sort condemned by the Supreme Court, arises.

4        33.    Once the speculators locate an individual who meets their investment

5    profile and, more importantly, will agree to collaborate in the STOLI arrangement,

6    an application is made for one or more insurance policies.  The speculators

7    typically pay most or all of the prospective insured's costs, including premium

8    payments.  Some speculators even agree to pay the prospective insured a fee or

9    other compensation upon the issuance of the policy.

10       34.    In many instances, STOLI policies are tainted by fraud in the

11   application and/or other supporting documentation presented to, and relied upon

12   by, the insurance carriers in determining whether to issue a policy.  Promoters of

13   STOLI policies look to turn a quick profit, and frequently provide the insurer with

14   false information during the application process in order to obtain a policy with a

15   larger face value than would legitimately be warranted given the insured's

16   financial circumstances.  This, in turn, maximizes the STOLI promoters' profit

17   when the policy is sold to investors.

18       35.    While there are many variations, all STOLI schemes have one thing in

19   common: their objective is to give investors with no insurable interest in the life of

20   the insured a stake in a life insurance policy on the life of a complete stranger.

21   **B.    The STOLI Scheme at Issue**

22       36.    Beginning sometime prior to February 2010, Bartholomew, MBP,

23   Hoshimi, Chung and/or Does 1 through 10 (collectively referred to herein as the

24   "STOLI Promoters") and/or other investors looking to acquire the beneficial

25   interests in life insurance policies for investment purposes (the "STOLI

26   Investors"), executed a STOLI or otherwise improper and fraudulent scheme to

27   procure the Policies from Nationwide and/or other life insurance carriers.

28       37.    Upon information and belief, the STOLI Promoters and/or others

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

9

FIRST AMENDED COMPLAINT

working for them and/or on their behalf, encouraged the Insureds to participate in schemes whereby large face value life insurance policies would be applied for – policies that, if issued, would generate substantial commissions and possible proceeds in a sale in the secondary life insurance market for the benefit of the STOLI Investors.

38.    Upon information and belief, the STOLI scheme perpetrated by the STOLI Promoters involved life insurance policies being procured without the Insureds, any of the Insureds' family members, or anyone with a valid insurable interest in the Insureds lives paying the associated costs for the policies, including the premiums; rather, those costs were paid by third parties who were strangers to the Insureds.

39.    Upon information and belief, pursuant to the STOLI scheme, the STOLI Promoters advised Insureds that they could obtain free life insurance and/or that they would be compensated for their participation in the transaction in the form of money based upon a percentage of the face amount of the policy issued. The Insureds were told not to worry about having enough money to cover premium payments for the Policies; in fact, they would not have to pay for the policy premiums at all.  Upon information and belief, the STOLI Promoters even counseled the Insureds regarding what they should say during the underwriting process, including during interviews conducted on behalf of Nationwide.  Further, upon information and belief, the STOLI Promoters, provided false information on supplements to the policy application regarding the Insured's net worth, including the amount of the Insured's savings, the value of the Insured's residence, whether any portion of the premiums for the Policies would be financed; and whether any Insured or policy owner would receive payment in connection with the insurance applied for.

40.    In order to make the procurement of the life insurance policies appear legitimate and to conceal the scheme from Nationwide, upon information and

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

LA01/ 1094439.1

10

FIRST AMENDED COMPLAINT

belief, the scheme also involved, in some instances, the creation of insurance trusts that would be the record owners and beneficiaries of the policies (collectively, the "Insurance Trusts"). As part of the scheme, Insurance Trusts were created bearing the names of the Insureds that would be the putative owners and beneficiaries of the Policies. The purpose of identifying the Insurance Trusts as the Policies' beneficiaries was to make it appear that both the Policies and the Insurance Trusts were intended for legitimate purposes, and to make it appear as though the trusts had an insurable interest in the lives of the Insureds. However, upon information and belief, these trusts were mere straw entities intended to lend the appearance of a valid insurable interest where none existed.

41.     Upon information and belief, the Policies involved in this STOLI scheme were funded and financed by Bartholomew, MBP, Chung, Hoshimi, and/or Does 1-20 (and/or related entities). Further, the STOLI Promoters purposely concealed the funding and financing scheme from Nationwide by issuing payments in the amount of the premiums due on the Policies into the personal bank accounts of the Insureds and/or Insurance Trust accounts.

42.     Upon information and belief, the STOLI Promoters collaborated on the procurement of STOLI policies. Indeed, Gleeson serves as the trustee for Insurance Trusts owning at least two life insurance policies placed by Bartholomew (including the Lukacs and Maclay policies at issue in this action) which, upon information and belief, were procured as STOLI policies. Upon information and belief, the Insureds do not know and/or have never met the trustees and effectively lacked involvement in the formation of the Insurance Trusts.

43.     Upon information and belief, in reality, and from the outset, the Policies were applied for to generate significant commissions to benefit the STOLI Promoters and/or STOLI Investors, and so that the beneficial interests in the Policies could be sold to investors in the secondary market for life insurance.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

LA01/ 1094439.1

11

FIRST AMENDED COMPLAINT

## C.   MBP's Contract with Nationwide

44.   On or about April 1, 2010, Bartholomew signed a Master Sub-Distributor Agreement ("Sub-Distributor Agreement") on behalf of MBP Insurance Services, Inc.  The Sub-Distributor Agreement permitted MBP to market, distribute, and administer Nationwide insurance products as independent contractor of Nationwide.  See a copy of the Sub-Distributor Agreement attached as Exhibit "A", A, C, 1.5.

45.   The Sub-Distributor Agreement is governed by Ohio Law.  Id. at 9.8.

46.   In the Sub-Distributor Agreement, MBP agreed, inter alia, that it would "conduct its activities pertaining to [the Agreement] in material conformity with all applicable federal and state laws and/or regulations."  Id. at p. 2.  MBP also agreed to "comply with all lawful rules, practices, instructions, regulations, procedures and guidelines" as established by Nationwide.  Id. at  1.4.

47.   In the Sub-Distributor Agreement, MBP also agreed that it had no authority to "directly or indirectly rebate any portion of the premium to the insured or to any other party" or to "induce or attempt to induce any policyholder … to relinquish … their policy."  Id. at j, l.

48.   In the Sub-Distributor Agreement, Nationwide agreed to pay MBP compensation in consideration for the services provided by MBP in the form of commissions.  Id. at 4.1.

49.   The Sub-Distributor Agreement also provides that if Nationwide refunds premiums for any reason, MBP shall immediately repay Nationwide all such compensation or other payments.  Id. at 4.5.

50.   MBP further agreed to indemnify Nationwide, inter alia, for "any and all losses, claims, damages, liabilities or expenses" incurred by Nationwide as a "direct consequence" of (i) "any material misrepresentation or omission" or "misrepresentation or omission involving the sales subject to this Agreement"; (ii) "any failure by Sub-Distributor, its Agents or affiliated agencies, whether negligent

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    or intentional, to perform the duties and discharge the obligations contemplated in

2    this Agreement"; or (iii) "any fraudulent, unauthorized or wrongful acts or

3    omission by Sub-Distributor, its Agents or affiliated agencies."

4         51.    Bartholomew was appointed, inter alia, as an MBP "Agent" within the

5    meaning of the Sub-Distributor Agreement.

6         52.    Upon information and belief, in furtherance of the STOLI scheme,

7    Bartholomew submitted, through MBP, formal applications for life insurance on

8    the lives of Parham, Crosby, Wallace, Bell, DiCarlo, Lukacs and Maclay to

9    Nationwide beginning in approximately February of 2010.

10   **D.    The Parham Policy**

11        **i.    The Parham Policy Application**

12        53.    Upon information and belief, in furtherance of this STOLI scheme, on

13   or about February 17, 2010, Bartholomew submitted, through MBP, a formal

14   application (the "Parham Application") to Nationwide seeking $2 million in

15   coverage on the life of Parham.  At the time of the Parham Application, Parham

16   was 79 years old.

17        54.    The Parham Application was purportedly signed in Laguna Hills,

18   California on February 17, 2010 by Parham (as the proposed Insured), Howard B.

19   Abbott, as trustee of the Parham Trust (as the proposed applicant/ owner) and

20   Bartholomew (as the insurance producer).  The Parham Trust was also to be the

21   purported beneficiary of the Parham Policy.

22        55.    On or about February 17, 2010, a Life Financial Supplement to

23   Application (the "Parham Financial Supplement") was submitted in connection

24   with the Parham Application and signed by Parham and Abbott.  Parham and

25   Abbott represented on the Parham Financial Supplement that Parham had a

26   personal net worth of $4,616,000 and that the purpose of the insurance was for

27   "estate conservation."

28        56.    The Parham Financial Supplement asked, inter alia, the following

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

13

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    questions: "(10) Have you been involved in any discussion about the possible sale

2    or assignment of this policy to a life settlement, viatical, or other secondary market

3    provider? . . . (12) Will any portion of the premium for this policy be financed?

4    (13) Will any insured or policy owner receive any payment in connection with the

5    insurance issued on the basis of this application?"  Parham and Abbott answered

6    "no" to all of the above questions on the Parham Financial Supplement.

7         57.    In signing the Parham Financial Supplement, Parham and Abbott

8    represented that they understood that Nationwide would rely on their statements

9    therein determining the need and justification for the insurance applied for, and

10   represented that the answers provided were "true and accurate statements to the

11   best of [their] knowledge and belief as of the date of application for life insurance."

12        58.    On or about February 17, 2010, a Producer's Certificate was

13   submitted in connection with the Parham Application by Bartholomew.  On the

14   Producer's Certificate, Bartholomew represented that Parham had an annual

15   income of $308,000 and a net worth of $4,616,000.

16        59.    The Producer's Certificate asked, inter alia, the following questions:

17   "(11) Have you, the producer, been involved in any discussion about the possible

18   sale or assignment of this policy to a life settlement, viatical, or other secondary

19   market provider?  (12) Will any portion of the premium for this policy be

20   financed?  (13) Will any insured or policy owner receive any payment in

21   connection with the insurance issued on the basis of this application?"

22   Bartholomew answered "no" to all of the above questions on the Producer's

23   Certificate.

24        ii.    **Misrepresentations Regarding the Parham Policy**

25        60.    Upon information and belief, the information provided on the Parham

26   Financial Supplement and the Producer's Certificate was false because:  (i)

27   Parham,  Abbott and/or Bartholomew had been involved in discussions about the

28   possible sale or assignment of the Parham Policy to a life settlement, viatical, or

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

14

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

other secondary market provider; (ii) it was intended that premiums on the Parham Policy would be financed; (iii) it was intended that the Insured would receive payment in connection with the issuance of the Parham Policy; and (iv) the Parham Policy was not procured for the purpose of "estate conservation."

61.    Discovery may reveal that there were additional misrepresentations in the Parham Application, the Parham Financial Supplement and/or the Producer's Certificate.

62.    On or about March 30, 2010, Parham made a premium payment on the Parham Policy to Nationwide in the amount of $159,250.00.

63.    Upon information and belief, the STOLI Promoters and/or others acting with them and/or on their behalf provided Parham with $159,250.00 which was deposited into his personal bank account and used to fund the premium on the Parham Policy.

64.    Upon information and belief, the purpose of the deposit was to conceal from Nationwide the fact that the funds used to pay the premium on the Parham Policy did not originate from Parham or anyone related to him and with an insurable interest in his life.  Rather, upon information and belief, the payment on the Parham Policy was funded directly or indirectly by the STOLI Promoters and/or STOLI Investors and others working with them and/or on their behalf.

65.    Upon information and belief, at no time was there an intent for a person with an insurable interest in Parham's life to retain a beneficial interest in the Parham Policy and, consequently, the right to receive the death benefit payable under the Parham Policy.  Instead, upon information and belief, the Parham Policy was procured pursuant to a plan and agreement predating the application for, and the issuance of, the Parham Policy to procure the policy and transfer the policy to a STOLI Investor with no insurable interest in Parham's life.

66.    Upon information and belief, the Parham Policy was never intended to provide estate conservation for Parham, and the aforementioned misrepresentations

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

15

LA01/ 1094439.1

were made in the Parham Application, the Parham Financial Supplement and the Producer's Certificate to conceal the true purpose of the insurance, which was to financially benefit the STOLI Promoters and STOLI Investors which lacked an insurable interest in Parham's life.

### iii.   Issuance of the Parham Policy

67.   Based upon the Parham Application, the Parham Financial Supplement, the Producer's Certificate and the representations contained therein, a policy insuring Parham's life was approved for $2 million in coverage.  Policy number B500243730 (i.e., the Parham Policy) was issued by Nationwide on March 30, 2010 and placed in force by Nationwide on April 9, 2010.

68.   The misrepresentations in the Parham Application, the Parham Financial Supplement and the Producer's Certificate as described above were material in that they induced Nationwide to issue the Parham Policy.  Nationwide would not have issued the Parham Policy had the questions contained in the Parham Application, the Parham Financial Supplement and the Producer's Certificate been answered truthfully.

69.   In reliance upon the apparent validity of the Parham Policy, on or about April 12, 2010, Nationwide paid $207,025.00 in commissions on the Parham Policy.

### E.   The Crosby Policy

### i.   The Crosby Policy Application

70.   Upon information and belief, in furtherance of this STOLI scheme, on or about April 6, 2010, Bartholomew submitted, through MBP, a formal application (the "Crosby Application") to Nationwide seeking $3 million in coverage on the life of Crosby.  At the time of the Crosby Application, Crosby was 68 years old.

71.   The Crosby Application was purportedly signed in Newport Beach, California on April 6, 2010 by Crosby (as the proposed Insured, proposed

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

16

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    applicant and proposed owner), and Bartholomew (as the insurance producer).

2    Chambers was to be the purported beneficiary of the Crosby Policy.

3        72.    On or about April 6, 2010, a Life Financial Supplement to Application

4    (the "Crosby Financial Supplement") was submitted in connection with the Crosby

5    Application and signed by Crosby.  Crosby represented on the Crosby Financial

6    Supplement that she had a personal net worth of $4,550,000 and that the purpose

7    of the insurance was for "estate conservation" purposes.

8        73.    The Crosby Financial Supplement asked, inter alia, the following

9    questions:  "(10) Have you been involved in any discussion about the possible sale

10   or assignment of this policy to a life settlement, viatical, or other secondary market

11   provider? . . .(12) Will any portion of the premium for this policy be financed?

12   (13) Will any insured or policy owner receive any payment in connection with the

13   insurance issued on the basis of this application?"  Crosby answered "no" to all of

14   the above questions on the Crosby Financial Supplement.

15       74.    In signing the Crosby Financial Supplement, Crosby represented that

16   she understood that Nationwide would rely on her statements in determining the

17   need and justification for the insurance applied for, and represented that the

18   answers provided were "true and accurate statements to the best of [her]

19   knowledge and belief as of the date of application for life insurance."

20       75.    On or about April 5, 2010, a Producer's Certificate was submitted in

21   connection with the Crosby Application by Bartholomew.  On the Producer's

22   Certificate, Bartholomew represented that Crosby had an annual income of

23   $100,000.

24       76.    The Producer's Certificate asked, inter alia, the following questions:

25   "(11) Have you, the producer, been involved in any discussion about the possible

26   sale or assignment of this policy to a life settlement, viatical, or other secondary

27   market provider?  (12) Will any portion of the premium for this policy be

28   financed?  (13) Will any insured or policy owner receive any payment in

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   connection with the insurance issued on the basis of this application?"

2   Bartholomew answered "no" to all of the above questions on the Producer's

3   Certificate.

4        **ii.**    **Misrepresentations Regarding the Crosby Policy**

5        77.    Upon information and belief, the information provided on the Crosby

6   Financial Supplement and the Producer's Certificate was false because: (i) Crosby

7   and/or Bartholomew had been involved in discussions about the possible sale or

8   assignment of the Crosby Policy to a life settlement, viatical or other secondary

9   market provider; (ii) it was intended that the premiums on the Crosby Policy would

10   be financed; (iii) it was intended that the Insured would receive payment in

11   connection with the issuance of the Crosby Policy; and (iv) the Crosby Policy was

12   not procured for the purpose of "estate conservation."

13        78.    Discovery may reveal that there were additional misrepresentations in

14   the Crosby Application, the Crosby Financial Supplement and/or the Producer's

15   Certificate.

16        79.    On or about April 25, 2010, Crosby made a premium payment on the

17   Crosby Policy to Nationwide in the amount of $52,664.00.

18        80.    Upon information and belief, the STOLI Promoters and/or others

19   acting with them and/or on their behalf provided Crosby with $52,664.00 which

20   was deposited into her personal bank account and used to fund the premium on the

21   Crosby Policy.

22        81.    Upon information and belief, the purpose of the deposit was to

23   conceal from Nationwide the fact that the funds used to pay the premium on the

24   Crosby Policy did not originate from Crosby or anyone related to her and with an

25   insurable interest in her life.  Rather, upon information and belief, this payment on

26   the Crosby Policy was funded directly or indirectly by the STOLI Promoters

27   and/or others working with them and/or on their behalf.

28        82.    Upon information and belief, at no time was there an intent for a

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

LA01/ 1094439.1

18

FIRST AMENDED COMPLAINT

1  person with an insurable interest in Crosby's life to retain a beneficial interest in

2  the Crosby Policy and, consequently, the right to receive the death benefit payable

3  under the Crosby Policy. Instead, upon information and belief, the Crosby Policy

4  was procured pursuant to a plan and agreement predating the application for, and

5  the issuance of, the Crosby Policy to procure the policy and transfer the policy to a

6  STOLI Investor with no insurable interest in Crosby's life.

7        83.    Upon information and belief, the Crosby Policy was never intended to

8  provide estate conservation for Crosby, and the aforementioned misrepresentations

9  were made in the Crosby Application, the Crosby Financial Supplement and the

10  Producer's Certificate to conceal the true purpose of the insurance, which was to

11  financially benefit the STOLI promoters and STOLI investors which lacked an

12  insurable interest in Crosby's life.

13        **iii.**    **Issuance of the Crosby Policy**

14        84.    Based upon the Crosby Application, the Crosby Financial

15  Supplement, the Producer's Certificate and the representations contained therein, a

16  policy insuring Crosby's life was approved for $2 million in coverage. Policy

17  number B500258530 (i.e., the Crosby Policy) was issued by Nationwide on

18  April 28, 2010 and placed in force by Nationwide on May 14, 2010.

19        85.    The misrepresentations in the Crosby Application, the Crosby

20  Financial Supplement and the Producer's Certificate as described above were

21  material in that they induced Nationwide to issue the Crosby Policy. Nationwide

22  would not have issued the Crosby Policy had the questions contained in the Crosby

23  Application, the Crosby Financial Supplement and the Producer's Certificate been

24  answered truthfully.

25        86.    In reliance upon the apparent validity of the Crosby Policy, on or

26  about May 17, 2010, Nationwide paid $68,463.20 in commission on the Crosby

27  Policy.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

19

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

F.    **The Bell Policy**

    i.    **The Bell Policy Application**

87.    Upon information and belief, in furtherance of this STOLI scheme, on or about March 12, 2010, Bartholomew submitted, through MBP, a formal application (the "Bell Application") to Nationwide seeking $5 million in coverage on the life of Bell.  At the time of the Bell Application, Bell was 77 years old.

88.    The Bell Application was purportedly signed in Palm Desert, California on March 12, 2010 by Bell (as the proposed Insured) and Sandra (as the proposed applicant/owner) and Bartholomew (as the insurance producer).  Sandra was also the purported beneficiary of the Bell Policy.

89.    On or about March 12, 2010, a Life Financial Supplement to Application (the "Bell Financial Supplement") was submitted in connection with the Bell Application and signed by Bell and Sandra.  Bell and Sandra represented on the Bell Financial Supplement that Bell had a personal net worth of $12,655,000 and that the purpose of the insurance was for "estate conservation" purposes.

90.    The Bell Financial Supplement asked, inter alia, the following questions: "(10) Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider? . . . (12) Will any portion of the premium for this policy be financed? (13) Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?"  Bell and Sandra answered "no" to all of the above questions on the Bell Financial Supplement.

91.    In signing the Bell Financial Supplement, Bell and Sandra represented that they understood that Nationwide would rely on their statements in determining the need and justification for the insurance applied for, and represented that the answers provided were "true and accurate statements to the best of [their] knowledge and belief as of the date of application for life insurance."

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

20

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

92.     On or about March 12, 2010, a Producer's Certificate was submitted in connection with the Bell Application by Bartholomew.  On the Producer's Certificate, Bartholomew represented that Bell had an annual income of $631,000 and a net worth of $12,655,000.

93.     The Producer's Certificate asked, inter alia, the following questions: "(11) Have you, the producer, been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider?  (12) Will any portion of the premium for this policy be financed?  (13) Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?" Bartholomew answered "no" to all of the above questions on the Producer's Certificate.

**ii.     Misrepresentations Regarding the Bell Policy**

94.     Upon information and belief, the information provided on the Bell Financial Supplement and the Producer's Certificate was false because:  (i) Bell and/or Bartholomew had been involved in discussions about the possible sale or assignment of the Bell Policy to a life settlement, viatical or other secondary market provider; (ii) it was intended that premiums on the Bell Policy would be financed; (iii) it was intended that the Insured would receive payment in connection with the issuance of the Bell Policy; and (iv) the Bell Policy was not procured for the purpose of "estate conservation."

95.     Discovery may reveal that there were additional misrepresentations in the Bell Application, the Bell Financial Supplement and/or the Producer's Certificate.

96.     On or about May 10, 2010, Bell made a premium payment on the Bell Policy to Nationwide in the amount of $347,115.00.

97.     Upon information and belief, the STOLI Promoters and/or others acting with them and/or on their behalf provided Bell with $347,115.00 which was

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

21

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   deposited into his personal bank account and used to fund the premium on the Bell

2   Policy.

3       98.   Upon information and belief, the purpose of the deposit was to

4   conceal from Nationwide the fact that the funds used to pay the premium on the

5   Bell Policy did not originate from Bell or anyone related to him and with an

6   insurable interest in his life.  Rather, upon information and belief, this payment on

7   the Bell Policy was funded directly or indirectly by the STOLI Promoters and/or

8   others working with them and/or on their behalf.

9       99.   Upon information and belief, at no time was there an intent for a

10   person with an insurable interest in Bell's life to retain a beneficial interest in the

11   Bell Policy and, consequently, the right to receive the death benefit payable under

12   the Bell Policy.  Instead, upon information and belief, the Bell Policy was procured

13   pursuant to a plan and agreement predating the application for, and the issuance of,

14   the Bell Policy to procure the policy and transfer the policy to a STOLI Investor

15   with no insurable interest in Bell's life.

16       100.   Upon information and belief, the Bell Policy was never intended to

17   provide estate conservation for Bell, and the aforementioned misrepresentations

18   were made in the Bell Application, the Bell Financial Supplement and the

19   Producer's Certificate to conceal the true purpose of the insurance, which was to

20   financially benefit the STOLI Promoters and STOLI Investors which lacked an

21   insurable interest in Parham's life.

22       **iii.**   **Issuance of the Bell Policy**

23       101.   Based upon the Bell Application, the Bell Financial Supplement, the

24   Producer's Certificate and the representations contained therein, a policy insuring

25   Bell's life was approved for $5 million in coverage.  Policy number B500240400

26   (i.e., the Bell Policy) was issued by Nationwide on May 10, 2010 and placed in

27   force by Nationwide on May 21, 2010.

28       102.   The misrepresentations in the Bell Application, the Bell Financial

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1  Supplement and the Producer's Certificate as described above were material in that

2  they induced Nationwide to issue the Bell Policy.  Nationwide would not have

3  issued the Bell Policy had the questions contained in the Bell Application, the Bell

4  Financial Supplement and the Producer's Certificate been answered truthfully.

5       103.   In reliance upon the apparent validity of the Bell Policy, on or about

6  May 24, 2010, Nationwide paid $451,249.50 in commission on the Bell Policy.

7  **G.    The Wallace Policy**

8       **i.    The Wallace Policy Application**

9       104.   Upon information and belief, in furtherance of this STOLI scheme, on

10  or about March 2, 2010, Bartholomew submitted, through MBP, a formal

11  application (the "Wallace Application") to Nationwide seeking $5 million in

12  coverage on the life of Wallace.  At the time of the Wallace Application, Wallace

13  was 72 years old.

14       105.   The Wallace Application was purportedly signed in Los Angeles,

15  California on March 2, 2010 by Wallace (as the proposed Insured, proposed

16  applicant, and proposed owner) and Bartholomew (as the insurance producer).

17  Freedman was to be the purported beneficiary of the Wallace Policy.

18       106.   On or about March 2, 2010, a Life Financial Supplement to

19  Application (the "Wallace Financial Supplement") was submitted in connection

20  with the Wallace Application and signed by Wallace.  Wallace represented on the

21  Wallace Financial Supplement that she had a personal net worth of $7-8 million

22  and that the purpose of the insurance was for "estate conservation."

23       107.   The Wallace Financial Supplement asked, inter alia, the following

24  questions: "(10) Have you been involved in any discussion about the possible sale

25  or assignment of this policy to a life settlement, viatical, or other secondary market

26  provider? . . . (12) Will any portion of the premium for this policy be financed?

27  (13) Will any insured or policy owner receive any payment in connection with the

28  insurance issued on the basis of this application?"  Wallace answered "no" to all of

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

23

FIRST AMENDED COMPLAINT

1    the above questions on the Wallace Financial Supplement.

2        108.   In signing the Wallace Financial Supplement, Wallace represented

3    that she understood that Nationwide would rely on her statements in determining

4    the need and justification for the insurance applied for, and represented that the

5    answers provided were "true and accurate statements to the best of [her]

6    knowledge and belief as of the date of application for life insurance."

7        109.   On or about March 2, 2010, a Producer's Certificate was submitted in

8    connection with the Wallace Application by Bartholomew.  On the Producer's

9    Certificate, Bartholomew represented that Wallace had an annual income of

10   $400,000, her spouse had an annual income of $600,000, and her net worth was

11   $8,600,000.

12       110.   The Producer's Certificate asked, inter alia, the following questions:

13   "(11) Have you, the producer, been involved in any discussion about the possible

14   sale or assignment of this policy to a life settlement, viatical, or other secondary

15   market provider?  (12) Will any portion of the premium for this policy be

16   financed?  (13) Will any insured or policy owner receive any payment in

17   connection with the insurance issued on the basis of this application?"

18   Bartholomew answered "no" to all of the above questions on the Producer's

19   Certificate.

20       ii.    **Misrepresentations Regarding the Wallace Policy**

21       111.   Upon information and belief, the information provided on the Wallace

22   Financial Supplement and the Producer's Certificate was false because:  (i)

23   Wallace and/or Bartholomew had been involved in discussions about the possible

24   sale or assignment of the Wallace Policy to a life settlement, viatical, or other

25   secondary market provider; (ii) it was intended that premiums on the Wallace

26   Policy would be financed; (iii) it was intended that the Insured would receive

27   payment in connection with the issuance of the Wallace Policy; and (iv) the

28   Wallace Policy was not procured for the purpose of "estate conservation."

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

LA01/ 1094439.1

24

FIRST AMENDED COMPLAINT

112.   Discovery may reveal that there were additional misrepresentations in the Wallace Application, the Wallace Financial Supplement and/or the Producer's Certificate.

113.   On or about May 18, 2010, Wallace made a premium payment on the Wallace Policy to Nationwide in the amount of $197,785.00.

114.   Upon information and belief, the STOLI Promoters and/or others acting with them and/or on their behalf provided Wallace with $197,785.00 which was deposited into her personal bank account and used to fund the premium on the Wallace Policy.

115.   Upon information and belief, the purpose of the deposit was to conceal from Nationwide the fact that the funds used to pay the premium on the Wallace Policy did not originate from Wallace or anyone related to her and with an insurable interest in her life.  Rather, upon information and belief, this payment on the Wallace Policy was funded directly or indirectly by the STOLI Promoters and/or others working with them and/or on their behalf.

116.   Upon information and belief, at no time was there an intent for a person with an insurable interest in Wallace's life to retain a beneficial interest in the Wallace Policy and, consequently, the right to receive the death benefit payable under the Wallace Policy.  Instead, upon information and belief, the Wallace Policy was procured pursuant to a plan and agreement predating the application for, and the issuance of, the Wallace Policy to procure the policy and transfer the policy to a STOLI Investor with no insurable interest in Wallace's life.

117.   Upon information and belief, the Wallace Policy was never intended to provide estate conservation for Wallace, and the aforementioned misrepresentations were made in the Wallace Application, the Wallace Financial Supplement and the Producer's Certificate to conceal the true purpose of the insurance, which was to financially benefit the STOLI Promoters and STOLI Investors which lacked an insurable interest in Wallace's life.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

25

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

### iii.     Issuance of the Wallace Policy

118.    Based upon the Wallace Application, the Wallace Financial Supplement, the Producer's Certificate and the representations contained therein, a policy insuring Wallace's life was approved for $5 million in coverage.  Policy number B500234220 (i.e., the Wallace Policy) was issued by Nationwide on May 18, 2010 and placed in force by Nationwide on June 11, 2010.

119.    The misrepresentations in the Wallace Application, the Wallace Financial Supplement and the Producer's Certificate as described above were material in that they induced Nationwide to issue the Wallace policy.  Nationwide would not have issued the Wallace Policy had the questions contained in the Wallace Application, the Wallace Financial Supplement and the Producer's Certificate been answered truthfully.

120.    In reliance upon the apparent validity of the Wallace Policy, on or about June 14, 2010, Nationwide paid $257,120.50 in commission on the Wallace Policy.

## H.     The DiCarlo Policy

### i.     The DiCarlo Policy Application

121.    Upon information and belief, in furtherance of this STOLI scheme, on or about May 1, 2010, Bartholomew submitted, through MBP, a formal application (the "DiCarlo Application") to Nationwide seeking $1.5 million in coverage on the life of DiCarlo.  At the time of the DiCarlo Application, DiCarlo was 72 years old.

122.    The DiCarlo Application was purportedly signed in Newport Beach, California on May 1, 2010 by DiCarlo (as the proposed Insured, proposed owner and proposed applicant), and Bartholomew (as the insurance producer).  Patrick was to be the purported beneficiary of the DiCarlo Policy.

123.    On or about May 1, 2010, a Life Financial Supplement to Application (the "DiCarlo Financial Supplement") was submitted in connection with the DiCarlo Application and signed by DiCarlo.  DiCarlo represented on the DiCarlo

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

Financial Supplement that she had a personal net worth of $4,350,000 and that the purpose of the insurance was for "estate conservation."

124. The DiCarlo Financial Supplement asked, inter alia, the following questions: "(10) Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider? . . . (12) Will any portion of the premium for this policy be financed? (13) Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?" DiCarlo answered "no" to all of the above questions on the DiCarlo Financial Supplement.

125. In signing the DiCarlo Financial Supplement, DiCarlo represented that she understood that Nationwide would rely on her statements in determining the need and justification for the insurance applied for, and represented that the answers provided were "true and accurate statements to the best of [her] knowledge and belief as of the date of application for life insurance."

126. On or about May 1, 2010, a Producer's Certificate was submitted in connection with the DiCarlo Application by Bartholomew. On the Producer's Certificate, Bartholomew represented that DiCarlo had an annual income of $50,000, her spouse had an annual income of $300,000, and her net worth was $4,350,000.

127. The Producer's Certificate asked, inter alia, the following questions: "(11) Have you, the producer, been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider? (12) Will any portion of the premium for this policy be financed? (13) Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?" Bartholomew answered "no" to all of the above questions on the Producer's Certificate.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

27

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

ii.     **Misrepresentations Regarding the DiCarlo Policy**

128.    Upon information and belief, the information provided on the DiCarlo Financial Supplement and the Producer's Certificate was false because:  (i) DiCarlo and/or Bartholomew had been involved in discussions about the possible sale or assignment of the DiCarlo Policy to a life settlement, viatical, or other secondary market provider; (ii) it was intended that premiums on the DiCarlo Policy would be financed; (iii) it was intended that the Insured would receive payment in connection with the issuance of the DiCarlo Policy; and (iv) the DiCarlo Policy was not procured for the purpose of "estate conservation."

129.    Discovery may reveal that there were additional misrepresentations in the DiCarlo Application, the DiCarlo Financial Supplement and/or the Producer's Certificate.

130.    On or about June 2, 2010, DiCarlo made a premium payment on the DiCarlo Policy to Nationwide in the amount of $55,304.00.

131.    Upon information and belief, the STOLI Promoters and/or others acting with them and/or on their behalf provided DiCarlo with $55,304.00 which was deposited into her personal bank account and used to fund the premium on the DiCarlo Policy.

132.    Upon information and belief, the purpose of the deposit was to conceal from Nationwide the fact that the funds used to pay the premium on the DiCarlo Policy did not originate from DiCarlo or anyone related to her and with an insurable interest in her life.  Rather, upon information and belief, this payment on the DiCarlo Policy was funded directly or indirectly by the STOLI Promoters and/or others working with them and/or on their behalf.

133.    Upon information and belief, at no time was there an intent for a person with an insurable interest in DiCarlo's life to retain a beneficial interest in the DiCarlo Policy and, consequently, the right to receive the death benefit payable under the DiCarlo Policy.  Instead, upon information and belief, the DiCarlo Policy

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

28

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   was procured pursuant to a plan and agreement predating the application for, and

2   the issuance of, the DiCarlo Policy to procure the policy and transfer the policy to

3   a STOLI Investor with no insurable interest in DiCarlo's life.

4         134.   Upon information and belief, the DiCarlo Policy was never intended

5   to provide estate conservation for DiCarlo, and the aforementioned

6   misrepresentations were made in the DiCarlo Application, the DiCarlo Financial

7   Supplement and the Producer's Certificate to conceal the true purpose of the

8   insurance, which was to financially benefit the STOLI Promoters and STOLI

9   Investors which lacked an insurable interest in DiCarlo's life.

10       **iii.**   **Issuance of the DiCarlo Policy**

11         135.   Based upon the DiCarlo Application, the DiCarlo Financial

12   Supplement, the Producer's Certificate and the representations contained therein, a

13   policy insuring DiCarlo's life was approved for $1.5 million in coverage.  Policy

14   number B500270960 (i.e., the DiCarlo Policy) was issued by Nationwide on

15   June 2, 2010 and placed in force by Nationwide on June 11, 2010.

16         136.   The misrepresentations in the DiCarlo Application, the DiCarlo

17   Financial Supplement and the Producer's Certificate as described above were

18   material in that they induced Nationwide to issue the DiCarlo Policy.  Nationwide

19   would not have issued the DiCarlo Policy had the questions contained in the

20   DiCarlo Application, the DiCarlo Financial Supplement and the Producer's

21   Certificate been answered truthfully.

22         137.   In reliance upon the apparent validity of the DiCarlo Policy, on or

23   about June 14, 2010, Nationwide paid $71,894.55 in commission on the DiCarlo

24   Policy.

25   **I.**   **The Lukacs Policy**

26       **i.**   **The Lukacs Policy Application**

27         138.   Upon information and belief, in furtherance of this STOLI scheme, on

28   or about May 6, 2010, Bartholomew submitted, through MBP, a formal application

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

29

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   (the "Lukacs Application") to Nationwide seeking $1 million in coverage on the

2   life of Lukacs. At the time of the Lukacs Application, Lukacs was 70 years old.

3       139.   The Lukacs Application was purportedly signed in Los Angeles,

4   California on May 6, 2010 by Lukacs (as the proposed Insured), Gleeson, as the

5   trustee of the Lukacs Trust (as the proposed owner and proposed applicant) and

6   Bartholomew (as the insurance producer). The Lukacs Trust was also to be the

7   purported beneficiary of the Lukacs Policy.

8       140.   On or about May 6, 2010, a Life Financial Supplement to Application

9   (the "Lukacs Financial Supplement") was submitted in connection with the Lukacs

10  Application and signed by Lukacs and Gleeson. Lukacs and Gleeson represented

11  on the Lukacs Financial Supplement that Lukacs had a personal net worth of

12  $1,226,000 and that the purpose of the insurance was for "estate conservation"

13  purposes.

14      141.   The Lukacs Financial Supplement asked, inter alia, the following

15  questions: "(10) Have you been involved in any discussion about the possible sale

16  or assignment of this policy to a life settlement, viatical, or other secondary market

17  provider? . . . (12) Will any portion of the premium for this policy be financed?

18  (13) Will any insured or policy owner receive any payment in connection with the

19  insurance issued on the basis of this application?" Lukacs and Gleeson answered

20  "no" to all of the above questions on the Lukacs Financial Supplement.

21      142.   In signing the Lukacs Financial Supplement, Lukacs and Gleeson

22  represented that they understood that Nationwide would rely on their statements in

23  determining the need and justification for the insurance applied for, and

24  represented that the answers provided were "true and accurate statements to the

25  best of [their] knowledge and belief as of the date of application for life insurance."

26      143.   On or about May 6, 2010, a Producer's Certificate was submitted in

27  connection with the Lukacs Application by Bartholomew. On the Producer's

28  Certificate, Bartholomew represented that Lukacs had an annual income of

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

30

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    $93,000.

2         144.   The Producer's Certificate asked, inter alia, the following questions:

3    "(11) Have you, the producer, been involved in any discussion about the possible

4    sale or assignment of this policy to a life settlement, viatical, or other secondary

5    market provider?  (12) Will any portion of the premium for this policy be

6    financed?  (13) Will any insured or policy owner receive any payment in

7    connection with the insurance issued on the basis of this application?"

8    Bartholomew answered "no" to all of the above questions on the Producer's

9    Certificate.

10        **ii.    Misrepresentations Regarding the Lukacs Policy**

11        145.   Upon information and belief, the information provided on the Lukacs

12   Financial Supplement and the Producer's Certificate was false because:  (i)

13   Lukacs, Gleeson and/or Bartholomew had been involved in discussions about the

14   possible sale or assignment of the Lukacs Policy to a life settlement, viatical, or

15   other secondary market provider; (ii) it was intended that premiums on the Lukacs

16   Policy would be financed; (iii) it was intended that the Insured would receive

17   payment in connection with the issuance of the Lukacs Policy; (iv) the true

18   financial condition of Lukacs was concealed from Nationwide; and (v) the Lukacs

19   Policy was not procured for the purpose of "estate conservation."

20        146.   Discovery may reveal that there were additional misrepresentations in

21   the Lukacs Application, the Lukacs Financial Supplement and/or the Producer's

22   Certificate.

23        147.   On or about June 8, 2010, Lukacs made a premium payment on the

24   Lukacs Policy to Nationwide in the amount of $42,075.00.

25        148.   Upon information and belief, the STOLI Promoters and/or others

26   acting with them and/or on their behalf provided Lukacs with $42,075.00 which

27   was deposited into his personal bank account and used to fund the premium on the

28   Lukacs Policy.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

LA01/ 1094439.1

31

FIRST AMENDED COMPLAINT

149.   Upon information and belief, the purpose of the deposit was to conceal from Nationwide the fact that the funds used to pay the premium on the Lukacs Policy did not originate from Lukacs or anyone related to him and with an insurable interest in his life.  Rather, upon information and belief, this payment on the Lukacs Policy was funded directly or indirectly by the STOLI Promoters and/or others working with them and/or on their behalf.

150.   Upon information and belief, at no time was there an intent for a person with an insurable interest in Lukacs' life to retain a beneficial interest in the Lukacs Policy and, consequently, the right to receive the death benefit payable under the Lukacs Policy.  Instead, upon information and belief, the Lukacs Policy was procured pursuant to a plan and agreement predating the application for, and the issuance of, the Lukacs Policy to procure the policy and transfer the policy to a STOLI Investor with no insurable interest in Lukacs' life.

151.   Upon information and belief, the Lukacs Policy was never intended to provide estate conservation for Lukacs, and the aforementioned misrepresentations were made in the Lukacs Application, the Lukacs Financial Supplement and the Producer's Certificate to conceal the true purpose of the insurance, which was to financially benefit the STOLI Promoters and STOLI Investors which lacked an insurable interest in Lukacs' life.

### iii.   Issuance of the Lukacs Policy

152.   Based upon the Lukacs Application, the Lukacs Financial Supplement, the Producer's Certificate and the representations contained therein, a policy insuring Lukacs was approved for $1 million in coverage.  Policy number B500276640 (i.e., the Lukacs Policy) was issued by Nationwide on June 8, 2010.

153.   The misrepresentations in the Lukacs Application, the Lukacs Financial Supplement and the producer's certificate as described above were material in that they induced Nationwide to issue the Lukacs Policy.  Nationwide would not have issued the Lukacs Policy had the questions contained in the Lukacs

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

32

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   Application, the Lukacs Financial Supplement and the Producer's Certificate been

2   answered truthfully.

3       154.   In reliance upon the apparent validity of the Lukacs Policy, on or

4   about June 21, 2010, Nationwide paid $39,971.25 in commission on the Lukacs

5   Policy.

6   **J.**      **The Maclay Policy**

7          **i.**       **The Maclay Policy Application**

8       155.   Upon information and belief, in furtherance of this STOLI scheme, on

9   or about May 7, 2010, Bartholomew submitted, through MBP, a formal application

10  (the "Maclay Application") to Nationwide seeking $2 million in coverage on the

11  life of Maclay.  At the time of the Maclay Application, Maclay was 77 years old.

12      156.   The Maclay Application was purportedly signed in Malibu, California

13  on May 6, 2010 by Maclay (as the proposed Insured), Gleeson, as trustee of the

14  Maclay Trust (as the proposed owner and proposed applicant) and Bartholomew

15  (as the insurance producer).  The Maclay Trust was to be the purported beneficiary

16  of the Maclay Policy.

17      157.   In the Maclay Application, Maclay and Gleeson represented that he

18  had no other insurance in force but that he had simultaneously submitted an

19  application to "WCL" but that only one offer would be accepted.

20      158.   Upon information and belief, not only did Maclay obtain the

21  Nationwide policy but he also accepted the offer for a $2 million West Coast Life

22  Policy.

23      159.   On or about May 7, 2010, a Life Financial Supplement to Application

24  (the "Maclay Financial Supplement") was submitted in connection with the

25  Maclay Application and signed by Maclay and Gleeson.  Maclay and Gleeson

26  represented on the Maclay Financial Supplement that Maclay had a personal net

27  worth of $5,350,000 and that the purpose of the insurance was for "estate

28  conservation" purposes.

LA01/ 1094439.1

160.   The Maclay Financial Supplement asked, inter alia, the following questions: "(10) Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider? . . . (12) Will any portion of the premium for this policy be financed? (13) Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?"  Maclay and Gleeson answered "no" to all of the above questions on the Maclay Financial Supplement.

161.   In signing the Maclay Financial Supplement, Maclay and Gleeson represented that they understood that Nationwide would rely on their statements in determining the need and justification for the insurance applied for, and represented that the answers provided were "true and accurate statements to the best of [their] knowledge and belief as of the date of application for life insurance."

162.   On or about May 7, 2010, a Producer's Certificate was submitted in connection with the Maclay Application by Bartholomew.  On the Producer's Certificate, Bartholomew represented that Maclay had an annual income of $305,000, Maclay's spouse had an annual income of $25,000, and that Maclay had a net worth of $5,350,000.

163.   The Producer's Certificate asked, inter alia, the following questions: "(11) Have you, the producer, been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider?  (12) Will any portion of the premium for this policy be financed?  (13) Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?" Bartholomew answered "no" to all of the above questions on the Producer's Certificate.

164.   On May 11, 2010, Bartholomew submitted a letter to Nationwide's underwriting department noting that his "professional associate," Steve Hoshimi, had introduced Bartholomew to Maclay.  Bartholomew went on to represent in the

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

34

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   letter that Maclay had approximately $400,000 of cash on hand, and an average

2   income of approximately $350,000 per year and that the insurance coverage was

3   desired to cover tax liability Maclay's children would accrue from inheritance of

4   Maclay's estate.

5       **ii.**   **Misrepresentations Regarding the Maclay Policy**

6       165.  Upon information and belief, the information provided on the Maclay

7   Financial Supplement and the Producer's Certificate was false because:  (i)

8   Maclay, Gleeson and/or Bartholomew had been involved in discussions about the

9   possible sale or assignment of the Maclay Policy to a life settlement, viatical, or

10  other secondary market provider; (ii) it was intended that premiums on the Maclay

11  Policy would be financed; (iii) it was intended that the Insured would receive

12  payment in connection with the issuance of the Maclay Policy; (iv) the Maclay

13  Policy was not procured for the purpose of "estate conservation"; and (v) another

14  policy insuring Maclay's life was procured at the same time that the Maclay Policy

15  was obtained.

16      166.  Discovery may reveal that there were additional misrepresentations in

17  the Maclay Application, the Maclay Financial Supplement and/or the Producer's

18  Certificate.

19      167.  On June 15, 2010, Maclay made a premium payment on the Maclay

20  Policy to Nationwide in the amount of $128,644.00.

21      168.  Upon information and belief, the STOLI Promoters and/or others

22  acting with them and/or on their behalf provided Maclay with $128,644.00 which

23  was deposited into his personal bank account and used to fund the premium on the

24  Maclay Policy.

25      169.  Upon information and belief, the purposes of the deposit was to

26  conceal from Nationwide the fact that the funds used to pay the premium on the

27  Maclay Policy did not originate from Maclay or anyone related to him and with an

28  insurable interest in his life.  Rather, upon information and belief, this payment on

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

LA01/ 1094439.1

35

FIRST AMENDED COMPLAINT

1   the Maclay Policy was funded directly or indirectly by the STOLI Promoters

2   and/or others working with them and/or on their behalf.

3        170.   Upon information and belief, at no time was there an intent for a

4   person with an insurable interest in Maclay's life to retain a beneficial interest in

5   the Maclay Policy and, consequently, the right to receive the death benefit payable

6   under the Maclay Policy.  Instead, upon information and belief, the Maclay Policy

7   was procured pursuant to a plan and agreement predating the application for, and

8   the issuance of, the Maclay Policy to procure the policy and transfer the policy to a

9   STOLI Investor with no insurable interest in Maclay's life.

10       171.   Upon information and belief, the Maclay Policy was never intended to

11  provide estate conservation for Maclay, and the aforementioned misrepresentations

12  were made in the Maclay Application, the Maclay Financial Supplement and the

13  Producer's Certificate to conceal the true purpose of the insurance, which was to

14  financially benefit the STOLI Promoters and the STOLI Investors which lacked an

15  insurable interest in Maclay's life.

16       **iii.   Issuance of the Maclay Policy**

17       172.   Based upon the Maclay Application, the Maclay Financial

18  Supplement, the Producer's Certificate and the representations contained therein, a

19  policy insuring Maclay's life was approved for $2 million in coverage.  Policy

20  number B500276310 (i.e., the Maclay Policy) was issued by Nationwide on

21  June 15, 2010 and placed in force by Nationwide on June 25, 2010.

22       173.   The misrepresentations in the Maclay Application, the Maclay

23  Financial Supplement and the Producer's Certificate as described above were

24  material in that they induced Nationwide to issue the Maclay Policy.  Nationwide

25  would not have issued the Maclay Policy had the questions contained in the

26  Maclay Application, the Maclay Financial Supplement and the Producer's

27  Certificate been answered truthfully.

28       174.   In reliance upon the apparent validity of the Maclay Policy, on or

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

36

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

about June 28, 2010, Nationwide paid $167,237.20 in commission on the Maclay Policy.

**K.** **Premium Received and Commission Paid on the Policies**

175.   Nationwide received a total of $982,837.00 in premium on the Policies.

176.   Nationwide has paid a total of $1,262,961.20 in commission on the Policies.

**COUNT I**

**BREACH OF CONTRACT**

**(Against MBP)**

177.   Nationwide hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

178.   The Parham Application, the Crosby Application, the Bell Application, the Wallace Application, the DiCarlo Application, the Lukacs Application and the Maclay Application are hereinafter collectively referred to as the "Applications."  Likewise the Parham Financial Supplement, the Crosby Financial Supplement, the Bell Financial Supplement, the Wallace Financial Supplement, the Lukacs Financial Supplement and the Maclay Financial Supplement are hereinafter referred to collectively as the "Financial Supplements."

179.   Upon information and belief, MBP breached its Sub-Distributor Agreement with Nationwide by: (i) soliciting, directly or indirectly, the Insureds' and others' participation in a STOLI arrangement; (ii) submitting to Nationwide Applications that MPB knew lacked an insurable interest and/or contained material misrepresentations; (iii) participating in, facilitating, or directing the establishment of Insurance Trusts to conceal the absence of an insurable interest in connection with the Policies; (iv) falsely certifying on the Producer's Certificates the Insureds' annual income and net worth; (v) falsely certifying on the Producer's Certificates that there had been no discussions about the possible sale or assignment of the

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

37

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   Policy on the secondary market; that no portion of the premium would be financed;

2   and that the Insured or owner did not receive any payment in connection with the

3   insurance issued on the basis of the Applications; (vi) violating applicable law and

4   regulations through involvement in the STOLI scheme; (vii) paying premiums on

5   the Policies or rebating premiums or commissions directly or indirectly; (viii)

6   soliciting and/or facilitating the transfer of the beneficial interest in the Policies;

7   and (ix) concealing from Nationwide that there was a lack of an insurable interest

8   at the inception of the Policies and that the Applications and the Producer's

9   Certificates contained material inaccuracies.

10      180.   As a proximate result of MBP's breach of the Sub-Distributor

11   Agreement, Nationwide has incurred substantial damages as a result of MBP's

12   wrongful conduct and breach of contract, including, among other things, costs and

13   expenses associated with the issuance of the Policies, payment of commission on

14   the Policies and expenses incurred in bringing this action for relief.

15      181.   Furthermore, in the event that the Policies are not declared void,

16   Nationwide will incur damages in the amount of the death benefits to be paid on

17   the Policies.  Such damages are a result of MBP's wrongful conduct and breach of

18   contract.

19      182.   Moreover, if Nationwide is required to refund any portion of the

20   premium on any of the Policies, MBP is contractually obligated to return the

21   corresponding commission pursuant to the terms of the Sub-Distributor's

22   Agreement.

23                              **COUNT II**

24                         **INDEMNIFICATION**

25                           **(Against MBP)**

26      183.   Nationwide hereby incorporates by reference each and every averment

27   contained in the preceding paragraphs as if set forth herein at length.

28      184.   As set forth above, MPB and Nationwide entered into the Sub-

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES                                 38

                                     FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1  Distributor Agreement.

2  185.   The Sub-Distributor Agreement provides MBP will indemnify

3  Nationwide, inter alia, for "any and all losses, claims, damages, liabilities or

4  expenses" incurred by Nationwide as a "direct consequence" of (i) "any material

5  misrepresentation or omission" or "misrepresentation or omission involving the

6  sales subject to this Agreement"; (ii) "any failure by Sub-Distributor, its Agents or

7  affiliated agencies, whether negligent or intentional, to perform the duties and

8  discharge the obligations contemplated in this Agreement"; or (iii) "any fraudulent,

9  unauthorized or wrongful acts or omissions by Sub-Distributor, its Agents or

10  affiliated agencies."

11  186.   The Policies were procured pursuant to the Sub-Distributor

12  Agreement.

13  187.   To the extent that Nationwide has incurred or will incur any losses,

14  damages, liabilities or expenses in connection with the Policies as a direct

15  consequence of the acts or omissions of MBP, its Agents or affiliated agencies,

16  Nationwide is entitled to indemnity from MBP.

17  ## COUNT III

18  ## DECLARATORY JUDGMENT – MATERIAL MISREPRESENTATIONS

19  ### (Against all Defendants)

20  188.   Nationwide hereby incorporates by reference each and every averment

21  contained in the preceding paragraphs as if set forth herein at length.

22  189.   Upon information and belief, Bartholomew, MBP, the Insureds and

23  the policy applicants/owners made material misrepresentations, respectively, to

24  Nationwide in the Applications, Financial Supplements and Producer's

25  Certificates.

26  190.   Upon information and belief, Bartholomew, MBP, the Insureds and

27  the policy applicants/owners, respectively, knew of the falsity of the

28  representations concerning: (i) whether there were discussions about the possible

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

39

LA01/ 1094439.1

FIRST AMENDED COMPLAINT

1   sale or assignment of the policies to a life settlement, viatical, or other secondary

2   market provider; (ii) whether the premiums on the policies being applied for would

3   be financed; (iii) whether the Insured would receive a payment in connection with

4   the issuance of the policies; (iv) the purpose for which the policies were being

5   procured; (v) the other insurance information; and (vi) the financial information

6   provided to Nationwide for each Insured.

7        191.   In the Applications and the Financial Supplements, the Insureds and

8   the policy applicants/owners, certified the truth of the representations that they

9   respectively made in the Applications and the Financial Supplements.

10       192.   In the Producer's Certificates, Bartholomew and MBP certified the

11  truth of the representations that they made.

12       193.   In signing the Applications, Bartholomew, MBP, the Insureds and the

13  policy applicants/owners also agreed that insurance would only take effect when

14  (1) a Policy is issued by Nationwide and accepted by the Insured; (2) the full first

15  premium is paid; and (3) all the answers and statements made on the application,

16  medical examination(s) and amendments "continue to be true."

17       194.   Therefore, in completing and signing the Applications, the Financial

18  Supplements and the Producer's Certificates, Bartholomew, MBP, the Insureds and

19  the policy applicants/owners knew that they were required to provide truthful and

20  accurate responses to the questions presented and that Nationwide would rely upon

21  the answers contained in the Applications, the Financial Supplements and the

22  Producer's Certificates in determining whether to issue a life insurance policy

23  insuring the lives of the Insureds.

24       195.   Nationwide justifiably relied on the aforementioned

25  misrepresentations.

26       196.   The aforementioned misrepresentations were material in that they

27  induced Nationwide to issue the Policies.

28       197.   Nationwide would not have issued the Policies if the information in

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

40

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    the Applications, the Financial Supplements and Producer's Certificates had been
2    answered truthfully.

3        198.   Nationwide is thus entitled to a judicial declaration that, pursuant to
4    applicable law, the Policies issued on the lives of Parham, Crosby, Bell, Wallace,
5    DiCarlo, Lukacs and Maclay are void ab initio, as they were issued by Nationwide
6    in reliance upon material misrepresentations or, in the alternative, that the
7    misrepresentations constitute grounds for rescission of these policies by
8    Nationwide.

9    **COUNT IV**

10   **DECLARATORY JUDGMENT – INSURABLE INTEREST**

11   **(Against all Defendants)**

12       199.   Nationwide hereby incorporates by reference each and every averment
13   contained in the preceding paragraphs as if set forth herein at length.

14       200.   On the facts averred above, there is now an actual controversy of a
15   justiciable nature as to whether the Policies were procured at the behest of, and/or
16   under the direction of, a party or parties with no insurable interest in the lives of
17   the Insureds and/or as part of a plan, intention and agreement to conceal that there
18   was a lack of insurable interest in connection with the Policies.

19       201.   Upon information and belief, at the time the Policies were issued, the
20   STOLI Promoters and/or others had a plan, scheme or design to, and with an
21   agreement in place to, sell the Policies and/or the beneficial interest in the trusts
22   owning the Policies to a third party on the secondary market for life insurance.

23       202.   Upon information and belief, the Policies were procured as a mere
24   cover for a wager on the lives of the Insureds and the purpose of these transactions
25   was to gamble upon the lives of the Insureds.

26       203.   Upon information and belief, the true purpose of the Policies was to
27   financially benefit the STOLI Promoters and STOLI Investors which lacked an
28   insurable interest in the lives of the Insureds.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

41

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

204.   Upon information and belief, neither the Insureds nor any of their family members (or anyone with an insurable interest in the lives of the Insureds) actually paid for the premiums for the Policies, as funding for the premium payments came from Bartholomew, MBP and/or Does 1-20, including STOLI Investors.  Therefore, the Insureds did not actually procure or effect the Policies.

205.   Upon information and belief, third parties with no insurable interest in the lives of the Insureds financially induced the Insureds to permit the procurement of the Policies with the intent to transfer the Policies to third parties with no insurable interest in the lives of the Insureds.

206.   Nationwide is entitled to a judicial declaration, in view of the Policies' apparent origin, that the Policies were unsupported at the time of their procurement by any legally cognizable insurable interest and are void ab initio.

207.   As a result of the actions of the STOLI Promoters and/or others leading to the procurement of the Policies, which were unsupported at inception by any legally cognizable insurable interest, Nationwide has sustained and will continue to sustain the aforementioned damages and may sustain additional damages in the future.

## COUNT V

## NEGLIGENT MISREPRESENTATION

**(Against Defendants Bartholomew, MBP, Parham, Crosby, Bell, Sandra, Wallace, DiCarlo, Maclay, Abbott, and Gleeson)**

208.   Nationwide hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

209.   Upon information and belief, the Insureds and the policy applicants/owners, respectively, made statements of material fact to Nationwide by: (i) falsely certifying in the Applications for the Policies and Financial Supplements, that "All of the answers and statements on this form are complete and true to the best of my knowledge and belief;" (ii) falsely certifying on the

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1  Financial Supplements that they were not involved in any discussion about the

2  possible sale or assignment of the policy to a life settlement, viatical, or other

3  secondary market provider; that no portion of the premium would be financed; and

4  that the Insureds or policy owners would not receive any payment in connection

5  with the insurance issued on the basis of the Applications; (iii) falsely certifying on

6  the Financial Supplements the true financial condition of the Insureds; and (iv)

7  falsely certifying on the Application the other insurance information for the

8  Insureds.

9        210.   Upon information and belief, Bartholomew and MPB made

10  statements of material fact to Nationwide by: (i) falsely certifying on the

11  Producer's Certificates that they were not involved in any discussion about the

12  possible sale or assignment of the policy to a life settlement, viatical, or other

13  secondary market provider; that no portion of the premium would be financed; and

14  that the Insureds or policy owners would not receive any payment in connection

15  with the insurance issued on the basis of the Applications; and (ii) falsely

16  certifying on the Producer's Certificates the financial and other insurance

17  information for the Insureds.

18        211.   The statements of material fact made by Bartholomew, MBP, the

19  Insureds and the policy applicants/owners were false and made without the

20  exercise of reasonable care.

21        212.   Bartholomew, MBP, the Insureds and the policy applicants/owners

22  knew or should have known that each of these statements were false, or made these

23  statements without reasonable grounds for believing them to be true.

24        213.   Bartholomew, MBP, Abbott and Gleeson made these statements in the

25  course of their business, profession or employment, intending or expecting that

26  Nationwide would be guided by these statements and rely on them in issuing the

27  Policies.

28        214.   Bartholomew and MBP had a duty to disclose to Nationwide correct

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

43

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1    and complete information in connection with the Applications for the Policy.

2        215.   Nationwide reasonably and justifiably relied on the statements of

3    Bartholomew, MBP, the Insureds and the policy applicants/owners in issuing the

4    Policies.

5        216.   Nationwide lacked knowledge of the falsity of the statements.

6        217.   Nationwide would not have issued the Policies had it known the true

7    facts surround the procurement of the Policies.

8        218.   As a proximate result of the negligent misrepresentations made by

9    Bartholomew, MBP, the Insureds and the policy applicants/owners, Nationwide

10   has sustained and will continue to sustain the aforementioned damages and may

11   continue to sustain additional damages in the future.

12                              **COUNT VI**

13                               **FRAUD**

14   **(Against Defendants Bartholomew, MBP, Hoshimi, Chung, Parham, Crosby,**

15     **Bell, Sandra, Wallace, DiCarlo, Maclay, Abbott, Gleeson, and Does 1 - 20)**

16       219.   Nationwide hereby incorporates by reference each and every averment

17   of fact contained in the preceding paragraphs as if set forth herein at length.

18       220.   Upon information and belief, as set forth above, Bartholomew, MBP,

19   the Insureds and the policy applicants/owners and/or others made fraudulent

20   misrepresentations regarding, among other things: (i) that there had been no

21   discussions about the possible sale or assignment of the Policies to a life

22   settlement, viatical or other secondary market provider; (ii) whether it was

23   intended that the premiums on the Policies would be financed; (iii) whether it was

24   intended that the Insureds or policy owners would receive a payment in connection

25   with the insurance issued on the basis of the Applications; (iv) the true purpose for

26   which the insurance was being obtained (i.e., to financially benefit the STOLI

27   Promoters and STOLI Investors which lacked an insurable interest in the lives of

28   the Insureds); (v) the true financial condition of the Insureds; and (vi) other

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

44

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

insurance information for the Insureds.

221.   Bartholomew, MBP, the Insureds and the policy applicants/owners and/or others intentionally made the aforementioned misrepresentations knowing they were false or with utter disregard and recklessness as to their falsity with the intention that Nationwide would rely on them in issuing the Policies.

222.   In addition, Bartholomew, MBP and/or others working with him and/or on his behalf submitted to Nationwide Producer's Certificates in support of the Applications.

223.   Upon information and belief, these Certificates were knowingly false.

224.   Each of the aforesaid fraudulent misrepresentations was material to Nationwide's decision to issue the Policies, and Nationwide justifiably relied on these fraudulent misrepresentations in issuing the Policies.  Indeed, Nationwide would not have issued the Policies if the Applications, the Financial Supplements and the Producer's Certifications had been answered truthfully or if Nationwide had known the true facts surrounding the procurement of the Policies.

225.   As a result of the wrongful conduct of Bartholomew, MBP, Hoshimi, Chung, Parham, Crosby, Bell, Sandra, Wallace, DiCarlo, Maclay, Abbott, Gleeson and Does 1-20, Nationwide has sustained and will continue to sustain the aforementioned damages and may sustain additional damages in the future.

226.   Nationwide is also entitled to an award of punitive damages based on the wanton, malicious, deliberate and/or grossly negligent conduct of Bartholomew, MBP, Hoshimi, Chung, Parham, Crosby, Bell, Sandra, Wallace, DiCarlo, Maclay, Abbott, Gleeson and Does 1-20 as described herein.

## COUNT VII

## CONSPIRACY

**(Against Defendants Bartholomew, MBP, Hoshimi, Chung, Parham, Crosby, Bell, Sandra, Wallace, DiCarlo, Maclay, Abbott, Gleeson and Does 1-20)**

227.   Nationwide hereby incorporates by reference each and every averment

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

45

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

of fact contained in the preceding paragraphs as if set forth herein at length.

228.   Upon information and belief, the Defendants and others conspired and agreed to commit a fraud to induce Nationwide to issue the Policies by, among other things, maliciously combining, participating in, facilitating, and/or directing the: (i) solicitation of the Insureds and the policy applicants/owners to participate in the STOLI scheme; (ii) submission of the Applications and the Financial Supplements and related documents to Nationwide; (iii) use of Insurance Trusts to conceal the absence of an insurable interest in connection with the Policies in violation of applicable insurance laws; (iv) concealment from Nationwide that there was a lack of an insurable interest at the inception of the Policies, that there had been a discussion regarding the possible sale or assignment of the Policies to a life settlement, viatical or other secondary market provider, that it was intended that the premiums on the Policies would be financed, that it was intended that the Insureds or policy owners would receive payment in connection with the insurance issued on the basis of the Applications, and the true reasons for which the Policies were procured; and (v) the transfer and concealment from Nationwide of the transfer of the Insurance Trust's and/or Policies' beneficial interest.

229.   Upon information and belief, in furtherance of their collaborative and conspiratorial combination and agreement to commit a fraud against Nationwide, the Defendants knowingly and purposefully concealed the lack of any insurable interest in connection with the Policies and knowingly and purposefully placed (and/or caused to be placed) false information on the Applications and the Financial Supplements in order to induce Nationwide to issue the Policies.  At all material times hereto, the Defendants acted in furtherance of a common plan, scheme, or design intended to benefit themselves and profit from the scheme at the expense of Nationwide.

230.   Upon information and belief, the Defendants knew of their own concealment, and that of their co-conspirators, regarding the lack of insurable

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

46

LA01/ 1094439.1

1  interest and the fraudulent misrepresentations made in connection with the

2  Policies.  Further, each knew that Nationwide would rely on these acts in

3  determining whether to issue the Policies.  The Defendants furthered this

4  conspiracy by, among other things, concealing the lack of any insurable interest in

5  the Policies by providing false information on the Applications and the Financial

6  Supplements and/or failing to correct false information, and providing the funds

7  required to procure and maintain the Policies.

8      231.  As a result of the wrongful and malicious conduct of Bartholomew,

9  MBP, Hoshimi, Chung, Parham, Crosby, Bell, Sandra, Wallace, DiCarlo, Maclay,

10  Abbott, Gleeson and Does 1-20, Nationwide has sustained and will continue to

11  sustain the aforementioned damages and may sustain additional damages in the

12  future.  Such damages are a result of Defendants' collective fraud and the

13  concealment of their fraud, which prevented Nationwide from discovering the

14  misrepresentations in the Applications and the Financial Supplements.

15                          **RELIEF REQUESTED**

16      WHEREFORE, Nationwide respectfully requests an award of damages

17  based on the fraud perpetrated against it and for the entry of an Order by this

18  Court:

19      A.    finding that MBP breached its contract with Nationwide;

20      B.    ordering the return of commission to Nationwide if Nationwide is

21  required to refund premium on any Policy at issue in this action;

22      C.    ordering MBP to indemnify Nationwide for all of Nationwide's

23  losses, claims, damages, liabilities or expenses, including but not limited to

24  attorneys' fees;

25      D.    declaring that the Policies, which are all within the contestable period,

26  are void due to material misrepresentations in the Applications and Financial

27  Supplements;

28      E.    declaring that the Policies are void due to a lack of insurable interest

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

LA01/ 1094439.1

1   at the inception of the Policies;

2       F.    declaring that Nationwide may retain some or all of the premiums

3   paid on the Policies;

4       G.    declaring that the Defendants are estopped from seeking a return of

5   the premiums paid on the Policies due to the fraudulent nature in which the

6   Policies were procured, to the extent necessary to restore the parties to the status

7   quo and otherwise offset Nationwide's costs as described above;

8       H.    awarding Nationwide compensatory damages as warranted under law;

9       I.    awarding Nationwide consequential damages as warranted under law;

10      J.    awarding Nationwide punitive damages as warranted under law;

11      K.    awarding Nationwide interest as warranted under law;

12      L.    awarding Nationwide attorneys' fees and costs, as determined by the

13   Court; and

14      M.    awarding Nationwide such further relief as this Court deems

15   appropriate.

16

17   Dated: March 29, 2012           DRINKER BIDDLE & REATH LLP

18

19                        By: _Paul Gelb_

20                           Paul M. Gelb

21                      ***Of Counsel***
                         Charles J. Vinicombe (Pro Hac Vice to be

22                      filed)
                         Nicole C. Wixted (Pro Hac Vice to be

23                      filed)
                         DRINKER BIDDLE & REATH LLP

24                      One Logan Square, Suite 2000
                         Philadelphia, PA 19103-6996

25                      (215) 988-2700
                         charles.vinicombe@dbr.com

26                      nicole.wixted@dbr.com

27                      Attorneys for Plaintiff
                         NATIONWIDE LIFE AND ANNUITY
                         INSURANCE COMPANY

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

LA01/ 1094439.1

48

FIRST AMENDED COMPLAINT

# EXHIBIT A

## MASTER SUB-DISTRIBUTOR AGREEMENT

THIS AGREEMENT ("Agreement") is made this 1st day of April, 2010, by and between Nationwide Life Insurance Company and Nationwide Life and Annuity Insurance Company (collectively, "Company") and MBP Insurance Svcs, Inc. ("Sub-Distributor").

### BACKGROUND

A.  Sub-Distributor markets insurance products, and recruits Agents to market insurance products.

B.  Company desires to enhance the marketing and sale of certain fixed insurance products issued by the Company or any insurance company affiliate of the Company ("Products").

C.  Company desires to appoint Sub-Distributor to market, distribute and administer the Products and to recruit and recommend Agents to the Company and any insurance company affiliate of the Company, to market Products, and Sub-Distributor desires to act as an agent of Company and any insurance company affiliate of the Company, and perform the services described in this Agreement, all upon the terms and subject to the conditions set forth more fully below.

### REPRESENTATIONS

### REPRESENTATIONS BY COMPANY

Company represents that it is duly licensed in accordance with all applicable laws and regulations and has the authority to issue Products in the states where the Sub-Distributor is authorized to conduct business, except as disclosed to Sub-Distributor in writing. Company agrees to notify Sub-Distributor promptly of any change in such authority.

Company will seek to have the Products approved by state insurance authorities in jurisdictions where those Products will be offered.

Company represents that the Products are designed to be treated as life insurance policies under the appropriate provisions of the Internal Revenue Code of 1986, as Amended (the "Code"). Company shall make every effort to maintain such treatment, and will promptly notify the Sub-Distributor upon having a reasonable basis for believing that such life insurance policies have ceased to be so treated or that they might not be so treated in the future.

Company represents that it will conduct its activities pertaining to this Agreement in material conformity with all applicable federal and state laws and/or regulations.

Company represents that all material that Company makes available to Sub-Distributor will comply in all material respects with any and all applicable federal and state securities laws.

Ga_admin/BGA/Agreements/Sub-Distributor Agreement Fixed 0110.doc/01.12.2010

Company represents that the entering into and performance of this Agreement does not and will not conflict with or cause a breach of any other agreement to which it is a party and that it has full power and authority to enter into this Agreement and to carry out its duties and obligations hereunder.

REPRESENTATIONS BY SUB-DISTRIBUTOR

Sub-Distributor represents that it has the authority to execute this Agreement on its own behalf and on behalf of any of its affiliated agencies providing the services set forth in this Agreement.

Sub-Distributor represents that it will conduct its activities pertaining to this Agreement in material conformity with all applicable federal and state laws and/or regulations.

Sub-Distributor represents that it and its affiliated agencies will comply with all applicable state insurance requirements and have obtained and will maintain any security and/or insurance licenses required by the state insurance authorities for the types of Products it offers and services.

Sub-Distributor represents that it has all necessary contractual arrangements in place to receive any payment for the sale of any Product on its behalf and on behalf of its affiliated agencies.

Sub-Distributor represents that it will solicit applications for Company only in those states in which such Products are approved.

Sub-Distributor represents that the entering into and performance of this Agreement does not and will not conflict with or cause a breach of any other agreement to which it is a party and that it has full power and authority to enter into this Agreement and to carry out its duties and obligations hereunder.

Sub-Distributor represents that it shall maintain sufficient fidelity bond coverage (including coverage for larceny and embezzlement) and errors and omissions insurance coverage as may be required under applicable law or as it deems necessary.

**NOW THEREFORE,** in consideration of the foregoing background recitals, representations and the mutual promises and undertakings set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    **AUTHORIZATION**

       1.1    **Appointment and Exclusivity.**  Company hereby appoints Sub-Distributor on a non-exclusive basis as an agent to solicit applications for the Products in each jurisdiction in which the Company is authorized to transact business and to perform the other duties set forth in this Agreement.  Sub-Distributor hereby accepts such appointment.

1.2    **Recruiting.**

a.    Sub-Distributor may recommend to the Company duly licensed Agents to solicit Products, subject to the requirements of Company. Company, in its sole discretion, may refuse to appoint any Agent recommended pursuant to this Section.

b.    For each Agent recommended to and acceptable to the Company, Agent shall enter into a written agreement with the Company (a "Producer Agreement") in form and content acceptable to Company. Company shall enter into a Producer Agreement directly with each Agent.

c.    Company may terminate the Producer Agreement with any Agent at any time and for any reason.

1.3    **Agents.** Each Agent shall be duly licensed and appointed at all times to offer, market, sell, distribute, and service the Products as required by law and the Producer Agreement.

1.4    **Instructions.** In performing its obligations under this Agreement, Sub-Distributor shall comply with all lawful rules, practices, instructions, regulations, procedures and guidelines (collectively, the "Instructions") as may be established by Company from time to time. Company will provide notice to Sub-Distributor of Instructions and any changes thereto by the same method Company communicates with its field force and not in accordance with the notice provisions set forth in Section 9.3 of this agreement.

1.5    **Status.** Sub-Distributor and Agents shall each be deemed an independent contractor to Company for all purposes. Within the scope of the authority conferred hereby, Sub-Distributor shall exercise its independent judgment in performing its duties and responsibilities hereunder. This Agreement shall not be construed to create the relationship of employer and employee between Company, on the one hand, and Sub-Distributor or any Agent, or any of their respective officers, directors, employees, agents or representatives, on the other.

1.6    **Limitations.** Unless otherwise authorized in writing by Company, Sub-Distributor shall have no authority on behalf of Company to:

a.    accept risks, determine insurability, or bind Company or any affiliate of company in any way;

b.    misrepresent any Products or services of Company or any affiliate of Company, make or modify Products or other Products on behalf of Company or any affiliate of Company, or waive any rights or requirements of Company or any affiliate of Company;

c.    extend the time of payment of any premium or accept the payment of past due premium;

d.    collect or receive deferred or renewal premiums;

e.    endorse, cash or deposit any check or draft made payable to Company or any affiliate of Company;

f.   accept or deposit any check or draft for premiums made payable to any person or entity other than Company;

g.   open any bank account or trust account on behalf of, for the benefit of, or containing the name of Company or any affiliate of Company;

h.   settle any claim or claims related to the Products;

i.   commence any suit or action before any court or authority relating to any of the Products;

j.   directly or indirectly rebate any portion of the premium to the insured or to any other party;

k.   directly or indirectly cause or attempt to cause any employee, agent or representative of Company or any affiliate of Company to terminate or alter his or her association with Company or such affiliate;

l.   induce or attempt to induce any policyholder of Company or any affiliate of Company to relinquish, surrender, replace or lapse their policies;

m.   incur any indebtedness on behalf of Company or any affiliate of Company;

n.   use, alter, amend or remove any trade name, brand, trademark or service mark of Company or any affiliate of Company (collectively, "Trademarks") from any Product or other property of the Company without prior written approval of Company;

o.   use any property of Company or any affiliate of Company, including but not limited to Trademarks, policy forms, applications, records, manuals, or supplies after termination of this Agreement; or

p.   do or perform any acts or things or exercise any authority on behalf of Company or any affiliate of Company other than as expressly authorized herein, without the prior written consent of Company.

2.   **SUB-DISTRIBUTOR RESPONSIBILITIES**

In addition to those duties set forth under Article 1 hereof, Sub-Distributor represents, warrants and covenants as follows:

2.1   **Legal Compliance and Licensing.**   Sub-Distributor shall at all times (i) hold, maintain and keep in good standing all licenses, registrations and appointments necessary to perform its duties hereunder, and (ii) fully comply with all applicable laws and regulations.

2.2   **Advertising Materials.**   All advertising material, including but not limited to internet websites and sales promotional material published by Sub-Distributor, that specifically name Company or reference the Products shall be submitted to Company for its approval prior to its use by Sub-Distributor. If required, Sub-Distributor shall be responsible for filing such material with the appropriate regulatory or governmental authority.

2.3   **Quotes.**   Sub-Distributor shall provide accurate quotations on premiums and interest rates for the Products.

2.4   **Applications.** Sub-Distributor shall promptly forward to Company all applications received in connection with the Products, regardless of the results of any medical examination. Company, in its sole discretion, may reject or require the amendment of any application for insurance.

2.5   **Suitability.** Sub-Distributor agrees to ensure it acts in accordance with the suitability standards required pursuant to any and all laws, rules or regulations adopted by any applicable state. At Company's periodic request, Sub-Distributor agrees to certify to Company that it is complying with suitability laws.

Sub-Distributor agrees to notify Company if any significant failures are discovered in the suitability of the sales of the products sold under this Agreement. In the event a claim against Company is made with regard to the suitability of a sale of any of the products sold under this Agreement, Sub-Distributor will reasonably cooperate with Company and will provide written or other materials upon Company's request.

2.6   **Collection of premiums.** Sub-Distributor shall:

   a.   Transmit to Company, within two business days of receipt, applications for a Product and all amounts received by Sub-Distributor for or on behalf of Company. All premium payments shall be in the form of checks made payable to Company.

   b.   Pay all premiums to Company without offset or deduction.

   c.   Be responsible for instructing its Agents to remit the entire premium to Company immediately upon receipt thereof, together with all applications and related information.

2.7   **Delivery of Products.** Sub-Distributor shall deliver Products as required by law. Notwithstanding the requirements of this section, Sub-Distributor shall not deliver a Product unless: (a) the person to be insured is in good health and insurable condition at the time of delivery and (b) the first premium has been fully paid.

2.8   **Maintenance of Products.** Sub-Distributor shall use best efforts to maintain in force the Products solicited by it or its Agents and shall render all reasonable assistance to the Company in connection therewith.

2.9   **Property.** Sub-Distributor shall return to Company upon termination of this Agreement or on demand, all property of Company, including but not limited to all records, manuals, supplies, policy forms and applications.

2.10   **Insurance.** Sub-Distributor shall at all times carry errors and omissions insurance in form and amount acceptable to Company, and shall furnish proof of such coverage upon request by Company.

2.11   **Indemnification.** Company agrees to indemnify and hold Sub-Distributor harmless from any and all losses, claims, damages, liabilities or expenses to which Sub-

Distributor may become subject under any statute, regulation, common law or otherwise, insofar as such losses, claims, damages, liabilities or expenses relate directly to the sale of the Products and arise as a direct consequence of:

1.  any material misrepresentation or omission, or alleged misrepresentation or omission, contained in the Products;

2.  any failure by Company or its employees, whether negligent or intentional, to perform the duties and discharge the obligations contemplated in this Agreement;

3.  any fraudulent, unauthorized or wrongful act or omission by Company, its employees, contractors or agents; and

4.  Company's misuse, modification and/or unauthorized use of the Marks or any claims that the Marks or materials provided to Sub-Distributor by Company pursuant to this Agreement constitute an infringement of title, copyright, trademark or other intellectual property rights of a third party, or piracy, plagiarism, or unfair competition or idea misappropriation under implied or express contract or any other cause of action in any way related to the Marks or materials provided to Sub-Distributor by Company pursuant to this Agreement.

Sub-Distributor agrees to indemnify and hold Company, their officers, directors, employees and agents harmless from any and all losses, claims, damages, liabilities or expenses to which Company may become subject under any statute, regulation, common law or otherwise, insofar as such losses, claims, damages, liabilities or expenses relate directly to the sale of the Products and arise as a direct consequence of:

1.  any material misrepresentation or omission, or alleged misrepresentation or omission involving the sales subject to this Agreement, provided that such misrepresentations or omissions are not caused by Company;

2.  any failure by Sub-Distributor, its Agents or affiliated agencies, whether negligent or intentional, to perform the duties and discharge the obligations contemplated in this Agreement;

3.  any fraudulent, unauthorized or wrongful act or omission by Sub-Distributor, its Agents or affiliated agencies;

4.  Sub-Distributor's misuse, modification and/or unauthorized use of the Marks or any claims that the Marks or materials provided to Company by Sub-Distributor pursuant to this Agreement constitute an infringement of title, copyright, trademark or other intellectual property rights of a third party, or piracy, plagiarism, or unfair competition or idea misappropriation under implied or express contract or any other cause of action in any way related to the Marks or materials provided to Company by Sub-Distributor pursuant to this Agreement; and

Exh. A   Page 54

5.  any and all actions conducted on the part of Sub-Distributor, its Agents or affiliated agencies resulting from a finding by any regulatory agency with jurisdiction over Company that a sale of a Contract was unsuitable.

In the event that Company is compelled or agrees to pay any amount in the settlement of any claim, judgment, arbitration or similar action pursuant this Section, Sub-Distributor shall reimburse Company. Company, in the alternative, may deduct the amount of such reimbursement obligation from any sales compensation subsequently payable to Sub-Distributor.

No party shall be liable, as the indemnifying party pursuant to this Section, to the extent that the losses, claims, damages, liabilities or legal expenses incurred by the indemnified party arise out of the indemnified party's willful misfeasance, bad faith, or gross negligence in the performance of its duties, or through the reckless disregard of the indemnified party's duties, under this Agreement.

The parties will promptly notify each other of the commencement of any litigation or proceedings, or the assertion of any claim or any material inquiries related to the duties set forth in the Agreement. The indemnifying party shall have control of the defense of any such action, including appeals, and of all negotiations relating thereto, including the right to effect the settlement or compromise thereof.

Nothing in this Section shall preclude the parties from exercising any other rights and remedies that may be available to them at law or in equity.

2.12  **Expenses.** Sub-Distributor shall be solely liable for all costs and expenses relating to or arising from performance of its obligations under this Agreement.

3.  **RECORDS AND REPORTING**

3.1  **Records.** Sub-Distributor will maintain full, complete and accurate books, files and records (collectively, the "Records") as may be required to record and document the services provided under this Agreement. Company shall have the right during regular business hours to examine, inspect and copy the Records. The Records shall either (i) be maintained by Sub-Distributor for a period of at least seven years following termination of this Agreement, or (ii) be delivered to Company for safe-keeping.

3.2  **Cooperation.** Sub-Distributor shall cooperate and use its best efforts to provide such other records and reports as Company may require in connection with this Agreement and the services contemplated hereunder.

4.    **FINANCIAL TERMS**

    4.1    **Payment of Compensations.** In consideration for the services provided by the Sub-Distributor under this agreement, the Company agrees to pay Sub-Distributor the compensation set forth on the commission schedule attached as Exhibit A ("Commission Schedule"). Distributor agrees to accept all commission payments via Automated Clearing House ("ACH") to the account specified below.

        Bank Name: _Chase_

        ABA #: ___REDACTED___

        Account # of Recipient: ___REDACTED___

        Account Type (Checking or Savings): _Checking_

    Upon receipt of prior written notice from Sub-Distributor and such other information as Company may require, Company shall pay on behalf of Sub-Distributor the commissions due from Sub-Distributor to each Agent under their respective General Agency Agreement or Producer Agreements in connection with the sale of the Products.

    Notwithstanding anything to the contrary in this Agreement, no Agent shall have any claim against the Company, and shall not be an intended or unintended third party beneficiary of this Agreement.

    Notwithstanding any other provision of this Agreement, Company shall not be obligated to pay any compensation which would be in violation of the applicable laws, rules or regulations of any jurisdiction.

    4.2    **Payment Procedures.** Company shall pay compensation (a) in accordance with its usual and customary procedures, which the Company, in its sole discretion, may change from time to time, and (b) only on premiums paid to Company. No premium shall be considered paid until it has been actually received by Company.

    4.3    **Changes in Commission Schedule; Unscheduled Commissions.** Company may, in its sole discretion (a) amend or modify the Commission Schedule except as to Products issued prior to the date of the change, and (b) determine commissions to be paid on products not provided for in the Commission Schedule.

    4.4    **Temporary Insurance.** Company shall not pay compensation in connection with any temporary insurance or binders.

    4.5    **Premium Refunds.** If Company refunds to a customer premium for any reason, the Sub-Distributor who received any compensation or other payment calculated in connection with the refunded premium shall immediately repay to Company all such compensation or other payments.

    4.6    **Reassignment.** Company may, in its sole discretion, remove Sub-Distributor or Agent as the servicing Agent of a Product and to reassign another agent to service

such Product. If the reassignment is requested by the policyholder under the Product, the Company will pay the compensation for such reassigned Product arising after the date of reassignment to the new agent.

4.7     **Replacements.** Compensation arising in connection with any Product that replaces an existing policy or product issued by the Company or any affiliate thereof shall be subject to replacement rules of the Company. In certain instances, Company will not pay compensation on replacements.

4.8     **Reinstatements.** If a Product written by Sub-Distributor is terminated and subsequently reinstated solely as a result of the efforts of Sub-Distributor, the Sub-Distributor shall continue to receive any renewal compensation from the date of reinstatement. If a Product is terminated and subsequently reinstated for any other reason, Company may determine, in its sole discretion, which Agent is entitled to renewal compensation and the amount of such compensation.

4.9     **State Law Restrictions.** Notwithstanding anything else in this Agreement, Company will not make any compensation payments in violation of any law, including, but not limited to, state licensing requirements. If applicable, no party may pay any compensation (including but not limited to any compensation or expense allowance), or may cause the payment of any compensation, that would be in violation of Section 4228 of the Insurance Law of the State of New York ("Section 4228"), and no party may receive any compensation in violation of Section 4228. The Sub-Distributor represents, warrants, and covenants that it has not received any benefits, compensation, or prizes or awards or taken any other action set forth in Section 4228(e)(11) that would require Company to monitor any payments Sub-Distributor may make or has made to any person for compliance with Section 4228.

4.10     **Indebtedness.** Any indebtedness which is now or may hereafter become due from the Sub-Distributor to Company or any of its subsidiaries shall be a first lien on all compensation payable under this Agreement until such indebtedness is fully paid, without limitation to any other rights of Company or its subsidiaries both prior to and after termination of this Agreement to recover such indebtedness.

This provision shall not be construed in any way to limit the amount of any indebtedness of the Sub-Distributor to the value of the commissions payable under this Agreement. In addition to deduction from commissions, the Company may take such other actions to recover or collect such indebtedness as it deems appropriate. To the extent the Company takes legal action to recover such indebtedness, it may recover attorney's fees, costs and expense from the Sub-Distributor.

If the Sub-Distributor is a corporation, the officer of the corporation personally signing this Agreement guarantees the performance of all its terms and condition, and hereby assumes personal liability and responsibility for any default in said items and condition, including personal responsibility and liability for repayment of any and all indebtedness owed the Company arising out of the terms of this Agreement without the necessity of the Company first enforcing any default against the corporate Sub-Distributor.

5.    **AMENDMENT AND TERMINATION**

5.1    **Term.** This Agreement shall have an initial term of one (1) year commencing on the Effective Date, and thereafter shall automatically renew for additional one (1) year periods.

5.2    **Amendment.** Company may amend any portion of this Agreement by giving Sub-Distributor written notice of the amendment.

5.3    **Termination.** Notwithstanding Section 5.1 hereof, any party to this Agreement may terminate the Agreement without cause upon 30 days' written notice to the other parties. Any party may terminate this Agreement for cause at any time, without prior written notice, if the other party: (1) fails to comply with the laws or regulations of any state or other governmental agency or body having jurisdiction over the sale of insurance or securities; (2) misappropriates any money or property belonging to another party, a contract owner or policyholder; (3) subjects another party to any actual or potential liability due to misfeasance, malfeasance, or nonfeasance; (4) commits any fraud upon another party, a contract owner or policyholder; (5) has an assignment for the benefit of creditors; (6) files a voluntary petition in bankruptcy or for reorganization or is adjudicated as bankrupt or insolvent; (7) has a liquidator or trustee appointed over its affairs and such appointment shall not have been terminated and discharged within sixty (60) days of such appointment; (8) fails to reimburse the other party for monies owed or, (9) commits a material breach of this Agreement.

Upon termination of this Agreement, Company may, at its sole discretion, terminate Sub-Distributor and Agent's access to Contract owner or policyholder records.

5.4    **No Recourse.** Sub-Distributor agrees that it shall have no recourse for any injury that it may suffer by reason of termination of this Agreement, and hereby waives all direct, indirect, incidental or consequential damages as against Company.

6.    **PRIVACY/CONFIDENTIALITY OF INFORMATION**

All information or knowledge exchanged pursuant to this Agreement is "Confidential Information." All nonpublic personal information, as defined by the Gramm-Leach-Blilely Act, exchanged pursuant to this Agreement is "Customer Information."

All parties to this Agreement ("Parties") shall agree to protect and maintain the Confidential Information with reasonable care, which shall not be less than the degree of care each party uses to protect its own Confidential Information.

Parties shall not use or disclose any Confidential Information except as necessary to perform the terms of this Agreement, and then only on a strict "need to know" basis. However, Parties may share Customer Information as required or permitted by law.

At the conclusion of this Agreement, Parties shall represent and warrant in writing that they have: (1) returned all remaining Confidential Information; (2) purged, deleted, or destroyed any Confidential Information that cannot be returned; or (3) will continue to safeguard all remaining Confidential Information, that cannot be returned, purged, deleted, or destroyed.

7.   ANTI-MONEY LAUNDERING

Sub-Distributor shall comply with all applicable and effective anti-money laundering (AML) laws, regulations, and rules including the Bank Secrecy Act as amended by Title III of the USA PATRIOT Act, its implementing regulations, and related rules promulgated by applicable regulators. Sub-Distributor shall also comply with the laws and regulations administered by the Office of Foreign Assets Control ("OFAC"). Collectively, these requirements include requirements to establish a written AML program, designate an AML officer, provide annual training to all appropriate employees and agents, report suspicious activities involving Products to both Company and regulators, scan records as required by OFAC, and make its AML program available to Company and regulators.

Sub-Distributor shall report to Company, without any undue delay, any unusual or suspicious activity or transaction involving customers and/or potential customers and involving the Products. Notice shall be made to the AML Compliance Director by fax to the number stated in the Notice Section of this Agreement. The Sub-Distributor shall ensure that any activity reported to Company remains confidential and that any report submitted to Company and/or any information related to such report is not disclosed to the customer(s) involved in such report or to any third party. Providing notice to Company of any suspicious activity shall not relieve Sub-Distributor of any duty it may independently have to report suspicious activities.

If any investigation arises under this Section involving Products under this Agreement, Sub-Distributor agrees to fully cooperate with Company in the investigation. Sub-Distributor will cooperate even if the investigation commences or continues after the Agreement is terminated.

8.   TRADEMARK CROSS-LICENSE

In connection with the performance of this Agreement, and subject to the other provisions contained herein, Sub-Distributor grants Company a limited nonexclusive, nontransferable license to use Sub-Distributor's trademarks, service marks, trade names and other intellectual property related thereto (hereinafter, "Marks"); and Company grants Sub-Distributor and its affiliates a nonexclusive, nontransferable license to use Company's Marks; provided that each party (i) does not create a unitary composite mark involving a Mark of the other party without the prior written approval of such other party; and (ii) displays symbols and notices clearly and sufficiently indicating the trademark status and ownership of the other party's Marks in accordance with applicable trademark law and practice. Each party must obtain the written approval of the other party prior to using the other party's Marks for any purpose other than those set forth in this Agreement.

Each party acknowledges the ownership of the other party in the Marks of the other party, and agrees that all use of the other party's Marks shall inure to the benefit, and be on behalf, of the other party.  Each party acknowledges that its use of the other party's Marks will not create in it, nor will it represent it has, any right, title, or interest in or to such Marks other than the licenses expressly granted herein.  Each party agrees not to do anything contesting or impairing the trademark rights of the other party.

Each party agrees that the nature and quality of its products and services supplied in connection with the other party's Marks shall conform to quality standards set by the other party.  Each party agrees to supply the other party, upon request, with a reasonable number of samples of any materials publicly disseminated by such party that utilizes the other party's Marks.  Each party agrees to promptly notify the other party in writing of any unauthorized use of the other party's marks of which it has actual knowledge.

Each party shall comply with all applicable laws, regulations, and customs and obtain any required government approvals pertaining to the use of the other party's Marks.

Each party shall have the sole right and discretion to bring proceedings against a third party alleging infringement of its Marks or unfair competition related thereto.  However, each party agrees to provide the other party with its reasonable cooperation and assistance with respect to any such infringement proceedings.

Upon termination of this Agreement, each party may retain only those marketing and other materials bearing the other party's name or Marks needed for archival and reference purposes.  Neither party may make reference in new marketing materials distributed to the general public as to its prior affiliation with the other party without that party's prior consent.

Failure to adhere to the standards of this cross-licensing agreement would result in immediate and irreparable damage to the owner of the Marks, for which there would be no adequate remedy at law, and would entitle the owner of the Marks to preliminary and injunctive relief in addition to all other available remedies in equity or law.

9.    **MISCELLANEOUS**

9.1    **Assignment.**  This Agreement shall be binding upon the parties and their respective successors and assigns. Sub-Distributor may not assign or pledge any rights under this Agreement without the prior written consent of Company.

9.2    **Entire Agreement.**    This Agreement (including Amendments, Exhibits, Addendums, and Compensation Schedules) constitutes the entire agreement among the parties and supersedes all prior agreements, understandings and arrangements, oral and written, among the parties with respect to the subject matter hereof.

9.3    **Notice.**  Except as provided in Section 1.4, communications sent pursuant to provisions of this Agreement shall be in writing, shall be delivered personally or sent by U.S. mail, facsimile, or commercial courier and shall be deemed given upon mailing.  However, any notice of change of address shall be deemed given only upon receipt by the party to be notified.

If to Company:

> Nationwide Life Insurance Company or
> Nationwide Life and Annuity Insurance Company
> ONE Nationwide Plaza
> 1-10-04
> Columbus, OH 43215
> Attention: BGA Sales/ Divisional Vice President
> Telephone:     (888) 767-7373
> Facsimile:     (614) 249-1552

or to such other address as Company may from time to time designate by written notice to Sub-Distributor.

If to Sub-Distributor: At the address set forth on the signature page hereto or to such other address as Sub-Distributor may from time to time designate by written notice to Company.

9.4   **Notice Of Legal Proceedings.** Sub-Distributor shall promptly transmit to the home office of Company, by certified mail, any paper or other documents served upon or delivered to Sub-Distributor or upon or to any of its respective directors, officers, employees, agents, or representatives in connection with any proceedings against or involving in any way Company or any of its directors, officers, employees, agents, or representatives.

9.5   **Waiver of Agreement.** The forbearance or neglect of Company or Sub-Distributor to insist upon strict compliance by a party with any of the provisions of this Agreement, whether continuing or not, or to declare a forfeiture or termination against that party, shall not be construed as a waiver of any of the rights or privileges of the parties. No waiver of any right or privilege of Company or Sub-Distributor arising from any default or failure of performance by a party shall affect the rights or privileges of the other parties in the event of a further default or failure of performance.

9.6   **Enforceability.** In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not be affected or impaired.

9.7   **Survival Of Provisions.** The following provisions shall survive termination of the Agreement: 2.6, 2.9, 2.10, 2.12, 3.1, 3.2, 4.6, 4.9, 4.10, 5.4, 6, 9

9.8   **Laws of Ohio.** This Agreement shall be governed and construed in accordance with the laws of the State of Ohio.

9.9   **Further Assurances.** The parties agree to execute and deliver, or cause to be executed and delivered, such other instruments, documents and undertakings as may reasonably be necessary to assure compliance with the terms of this Agreement.

9.10    **Power and Authority.** The Sub-Distributor has full power and authority to enter into and perform this Agreement, and the person(s) signing this Agreement on behalf of the Sub-Distributor has been properly authorized and empowered to do so. Each party acknowledges that it has read this Agreement, understands it and agrees to be bound by its terms.

9.11    **Paragraph Headings.** The paragraph headings are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

9.12    **Counterparts.** This Agreement may be executed in two or more counterparts. All counterparts shall collectively constitute a single instrument. The parties may execute and exchange facsimile counterparts of the signature page, and these facsimile signatures shall be binding as original signatures.

9.13    **Construction Of Agreement.** Neither of the parties hereto or their respective counsel shall be deemed to have drafted this Agreement for purposes of construing the terms hereof. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any party hereto.

**THE REST OF THIS PAGE LEFT INTENTIONALLY BLANK**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the effective date set forth below.

NATIONWIDE LIFE INSURANCE COMPANY AND/OR NATIONWIDE LIFE AND ANNUITY INURANCE COMPANY

By: _____
Assoc Vice President

SUB-DISTRIBUTOR

By: _____
Name: Joseph Bartholomew
Title: President
Effective Date: 3/12/10

Name of Sub-Distributor:

State of Incorporation: CA

Street Address

REDACTED

Telephone:

Facsimile: REDACTED

Email:

Ga_admin/BGA/Agreements/Sub-Distributor Agreement Fixed 0110 doc/01.12.2010

Exh. A   Page 63

PAUL M. GELB (State Bar No. 244439)
DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1400
Los Angeles, California 90067-1517
Tel: (310) 203-4000 / Fax: (310) 229-1285
paul.gelb@dbr.com

COPY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY, <br><br> PLAINTIFF(S) <br><br> V. <br><br> JOSEPH BARTHOLOMEW, MBP INSURANCE SERVICES, INC., ANDREW CHUNG, (Continued on Attachment "A"), <br><br> DEFENDANT(S). | **CASE NUMBER** <br><br> CV12-02752-GAF (MANx) <br><br><br> **SUMMONS** <br> **(on First Amended Complaint)** |

TO:DEFENDANT(S): JOSEPH BARTHOLOMEW, MBP INSURANCE SERVICES, INC., ANDREW CHUNG, STEVE HOSHIMI, HOWARD B. ABBOTT A/K/A H. BRUCE ABBOTT, INDIVIDUALLY AND AS TRUSTEE OF THE NORMAN PARHAM IRREVOCABLE TRUST, NORMAN E. PARHAM, GLENDA CROSBY, SUSAN CROSBY-CHAMBERS, MARILYN WALLACE, HERMINE FREEDMAN, PERCY BELL, SANDRA BELL, MARY JANE DICARLO, PATRICK N. DICARLO, DONALD MACLAY, ROBERT GLEESON, INDIVIDUALLY AND AS TRUSTEE OF THE IRREVOCABLE LIFE INSURANCE TRUST OF RICHARD LUKACS AND THE DONALD MACLAY FAMILY TRUST, AND DOES 1 THROUGH 10

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ ☐ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Paul M. Gelb, whose address is Drinker Biddle & Reath, LLP, 1800 Century Park East, Suite 1400, Los Angeles, California 90067. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __MAR 3 0 2012__ _____

By: _____SHEA BOURGEOIS_____
Deputy Clerk

(Seal of the Court)

SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

SUMMONS (on First Amended Complaint)

American LegalNet, Inc.
www.USCourtForms.com

ATTACHMENT "A"

**DEFENDANT(S) – Cont'd**

STEVE HOSHIMI, HOWARD B. ABBOTT A/K/A H. BRUCE ABBOTT, INDIVIDUALLY AND AS TRUSTEE OF THE NORMAN PARHAM IRREVOCABLE TRUST, NORMAN E. PARHAM, GLENDA CROSBY, SUSAN CROSBY-CHAMBERS, MARILYN WALLACE, HERMINE FREEDMAN, PERCY BELL, SANDRA BELL, MARY JANE DICARLO, PATRICK N. DICARLO, DONALD MACLAY, ROBERT GLEESON, INDIVIDUALLY AND AS TRUSTEE OF THE IRREVOCABLE LIFE INSURANCE TRUST OF RICHARD LUKACS AND THE DONALD MACLAY FAMILY TRUST, AND DOES 1 THROUGH 10

American LegalNet, Inc.
www.USCourtForms.com